Chance Edward SAUNDERS, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–88–363–CR.

Court of Appeals of Texas, Corpus Christi.

Feb. 28, 1994.

Janet Morrow, Houston, for appellant.

John B. Holmes, Jr., Timothy G. Taft, Houston, for appellee.

Before SEERDEN, C.J., and DORSEY and KENNEDY, JJ.

## OPINION

DORSEY, Justice.

Appellant was convicted of murder in Harris County and assessed a 75 year sentence.

On original submission this court affirmed. *Saunders v. State*, 780 S.W.2d 471 (Tex. App.—Corpus Christi 1989). The Court of Criminal Appeals granted petition for discretionary review and reversed on one ground of error: that the trial court erred in failing to instruct the jury on the lesser included offense of negligent homicide. That court remanded the cause to the Court of Appeals to consider whether appellant had been harmed by the trial court's omission in light of *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim.App.1985) (op. on reh'g), and *Arline v. State*, 721 S.W.2d 348 (Tex.Crim.App.1986). *Saunders v. State*, 840 S.W.2d 390 (Tex.Crim. App.1992) (per curiam).

The sole issue is whether appellant was harmed by the trial court's failure to instruct the jury on negligent homicide. The jury was charged on murder and involuntary manslaughter, and convicted appellant of murder. The quantum of harm required for reversal of a preserved charging error is stated in *Arline* as "some harm." The general rule we apply after finding error is to reverse the case "unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction." TEX.R.APP.P. 81(b)(2). We view these tests as largely synonymous in practice, although the Rule of Appellate Procedure begins with the presumption that error is harmful, in that reversal will occur unless we are satisfied there was no harm to the appellant.

In deciding whether the appellant was harmed, we look at the entire jury charge, the evidence, argument of counsel, and any other relevant matters that appear in the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171.

## EVIDENCE

Appellant was convicted of murdering Darrell McFadden, the five-month-old infant son of appellant's roommate/girlfriend, Reba McFadden. Appellant, a seventeen-year-old man, and Reba, a twenty-one-year old wom-

an, lived with Darrell in an apartment in Pasadena, Texas, beginning in September, 1987. The mother worked nights and would return home after work around 7 a.m. Appellant was unemployed and kept Darrell at the apartment while Reba worked. On October 17, 1987, Officer J.R. Johnson, a uniformed patrol officer with the Pasadena Police department, was dispatched to the couple's apartment in response to a call around 7:30 a.m.. Darrell was dead in his crib. Both Reba and appellant were there when Officer Johnson arrived.

Dr. Arrillo Espinola, a Harris County Medical Examiner who performed the autopsy, testified as to several injuries to the child. The immediate cause of death was a fracture of the coronal suture, which is the connection between the front and rear bones in the child's skull. He said the baby could live three or four hours after the injury and had been dead between two and eight hours when he was found. Death occurred sometime after midnight. The timing of the injury coincided with appellant's keeping the child overnight while the mother worked.

Dr. Espinola opined that the skull fracture was consistent with bruises found on the child's head that matched the fingers of an adult's hand. The bruising on the right side of the skull, attributed to adult fingers, indicated "squeezing" the skull more than once, while a single bruise on the other side was thought to be from a thumb. The doctor testified that not much pressure was required to crack the skull and no noise would result when it was fractured.

The defendant produced competing evidence which included medical testimony that disputed the cause and time of death. The range of time was expanded during the defense medical witness' testimony to include times that Reba McFadden was at home.

Darrell had multiple injuries; the principal one was a subdural hemorrhage, which would have caused death if left untreated and if death had not come earlier from the fractured skull. Dr. Espinola attributed the hemorrhage to severe shaking of the child,

rather than a fall or other trauma, occurring about fifteen days prior to death. There was a large, infected sore or ulcer on the back of the child's head which showed signs of treatment or cleansing. The child had abrasions on his ears and both sides of the lower part of the nose. The pathologist postulated that the injuries to the ears and nose were the result of pinching with fingers. Part of the child's frenulum (the muscle between the lip and the gum) was missing as a result of infection, another part was lacerated. Both injuries to the inside of the mouth could have been caused by slapping the face or squeezing the upper lip. There was injury to the liver that could have been caused by squeezing or shaking the child.

Several witnesses testified to seeing Darrell mistreated by the appellant in public settings. The earliest incident was on October 2, approximately two weeks before Darrell died. Diana Gutierrez, a cashier at an appliance store in Houston, said that while she was attending to a sale with Reba, appellant was holding a crying baby. The man's hand was over the baby's mouth and he was telling the child to "shut up." The child appeared to be struggling for air or trying to get away from the man's hand. Another employee saw the couple and the child in a different area of the store; appellant had his hand over the child's nose and mouth with a firm grip. The child had tears in his eyes.

Another salesman at the store, Walton Deerman, testified that on that same date two customers complained to him that there was a man "abusing a baby over there." He went over to see and saw a crying baby on a counter being held by appellant, whose right hand was holding the back of the baby's neck and squeezing it. The man was cursing the child, telling him to shut up, and shaking the child, as the witness demonstrated to the jury. Mr. Deerman approached the man, commented it was a pretty child, and walked away. The baby's face did not have a "normal glow." The salesman thought of calling "child welfare," but did not. Mr. Deerman later recognized the child from pictures in the news media reporting the death.

Stephanie Sabo, a married woman with a four-year-old child, reported the treatment of the child to Mr. Deerman. Mrs. Sabo testified that appellant had the child sitting on a counter in the store and was holding it across the stomach and by the back of the head. The child was crying and appellant was squeezing the back of the child's head forcefully while cursing the child. After Mr. Deerman approached and then left the child and appellant, the squeezing continued. The child cried continuously while Mrs. Sabo was in the store.

The next day a registered nurse, who was a customer in a video store, saw the couple with the child. She noticed a green and blue discoloration to the baby's forehead, and red blood inside the baby's nostrils. The child's eyes were glassy and did not change expression or move. He was not showing any response to stimulus while she was watching him. She said the baby needed some type of medical attention.

A salesman at a gun store saw the couple and the child in the store on October 10, 1987. The child's face was discolored and the head appeared to be swollen. He described the swelling as "very, very even," and asked the couple what had happened to their baby. Appellant responded that the child had hit himself on the coffee table. The couple left the store quickly. The clerk called Children's Protective Services, but was unable to speak with anyone. He never spoke with anyone at that office.

The first police officer to arrive at the scene of the baby's death testified that appellant told him that Reba had left for work and he was watching the baby. Appellant said that around 11 p.m. he gave the baby some water and appellant went to sleep. He was awakened by Reba telling him the baby was dead. In his first written statement, appellant said the child fell a couple of weeks earlier while standing at a coffee table, and the child did not appear to be hurt and° did not cry. In his second and last written statement, appellant said the child fell from a kitchen counter to the floor about a week and a half earlier and hit his head in the fall. Appellant did not testify at trial.

## THE CHARGE AND ARGUMENT

The charge authorized conviction of murder or involuntary manslaughter. To convict appellant of murder, the jury had to find that appellant intended to cause serious bodily injury and intentionally or knowingly committed an act clearly dangerous to human life, squeezing Darrell's head with his hand, causing death.

The State in final argument argued to the jury that there were two serious bodily injuries prior to death, the subdural hematoma and the liver injury, that were caused by shaking and squeezing the child by the appellant as witnessed in the appliance store. Counsel relied heavily on the testimony of the witnesses in the appliance store, that the child was being shaken forcefully and his head was being repeatedly squeezed by the appellant two weeks before Darrell's death. The State emphasized that in order to convict of murder appellant did not have to intend to kill the child; rather it was only necessary that he intended to cause serious injury to him. The State argued that the serious injuries revealed at autopsy and the testimony of witnesses to the dangerous treatment of the child by appellant showed that he had been injuring the child repeatedly and for some time prior to death, and thus was sufficient to show he intended to cause serious injury to the child. At the beginning of the state's closing argument, counsel displayed photographs of the child, alive and dead, so they would be in full view of the jury during her argument.

The jury began its deliberations at 11:30 a.m. and recessed for lunch at 12:30 p.m. It resumed deliberations at 2:05 and announced it had a verdict at 4:45 p.m. Four notes came from the jury; three dealt with administrative matters—lunch, a fan, and return of the charge to it. The fourth and final note came shortly before verdict was announced. It stated:

In the second paragraph of page No. 1 of the charge the definition of murder

states "... if he intends to cause serious bodily injury and intentionally or knowingly commits an act clearly dangerous to human life that causes the death of an individual."

On Page 2, paragraph 2 it states "... before a person can be found guilty of murder under the indictment, he must have intended to cause serious bodily injury and have committed an act clearly dangerous to human life that caused the death of the deceased."

There appears to be an inconsistency in the use of "intentionally or knowingly" referring to an act dangerous to human life in the definition on page 1 and the use of "intended" (only) to refer to an act clearly dangerous to human life in the sentence in page 2 paragraph 2.

Can you clarify the wording?

The court retrieved the charge from the jury and inserted the words "intentionally and knowingly" before the words "committed an act clearly dangerous to human life." [1] The amended charge was returned to the jury, which promptly returned a verdict of guilty.

## ANALYSIS

The time of death and injury was while appellant was alone with the child. The immediate cause of death was a fractured skull that could have been caused by squeezing Darrell's head with a hand. Appellant had squeezed the child's head with his hand in the past, so one could conclude the child was killed by appellant. The real issue is the appellant's mental state when he applied the force to the child's head. That he had done so before may be viewed as either a continuing intent to inflict serious bodily injury or a misguided attempt to control the child. The child had numerous visible injuries, scabs on its nose and ears, an open infected sore on

the back of its head, and bruises on its back and head. The skull fracture and subdural hematoma, although fatal or potentially fatal, were not readily visible, nor was the injury to the liver. However, one week before death the child's head was discolored and swollen.

The charge instructed the jury to first consider whether appellant murdered the child, and if it did not find that he had, then to consider whether appellant acted recklessly in causing the death of Darrell McFadden. The note from the jury indicates that it carefully reviewed the required mental state to convict of murder; after the charge was amended clarifying the jury's concern, it returned its verdict of guilty. It did not reach the question of a less culpable mental state.

■ The difference between the culpable mental states for involuntary manslaughter and criminally negligent homicide is appreciation of the risk. Recklessness requires that one perceive the risk and disregard it; in criminal negligence the actor simply does not perceive the risk that an ordinary person would recognize.

The sole question before us is whether the failure to instruct the jury that if the appellant negligently squeezed the head of the child causing death, it could find him guilty of negligent homicide. The failure to so instruct did not prevent appellant from arguing a less culpable mental state, indeed some attempt was made to argue that the crime was not one of murder because how did appellant know that serious bodily injury would result.

The policy behind the submission of lesser included offenses is to protect the integrity of the jury deliberations and to ensure that "the jury will accord the full benefit of the reasonable doubt standard." *Beck v. Alabama,* 447 U.S. 625, 634, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980).

A defendant is entitled to a lesser offense instruction—in this context or any other—

---

1. That corrected sentence in the charge read: "You are further instructed that before a person can be found guilty of murder under the indictment, he must have intended to cause serious bodily injury and have *intentionally or knowingly* committed an act clearly dangerous to human life that caused the death of the deceased." (The emphasized words were added by the trial judge when she amended the charge.)

precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction.

*Id.* (citing *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1972) (emphasis in original)).

It is not the function of an appellate court to sit as an omnipotent juror to determine what decision it would have reached under the evidence as to appellant's mental state at the time of the death. Rather, the question is whether the inclusion of the instruction on negligent homicide would have made any difference to the jury deciding the case. We conclude it would not, and hold that appellant suffered no harm as a result.

The judgment of the trial court is AFFIRMED.