Chance Edward SAUNDERS, Appellant,

v.

The STATE of Texas, Appellee.

No. 442–94.

Court of Criminal Appeals of Texas, En Banc.

Dec. 6, 1995.

Janet Morrow, Houston, for appellant.

Timothy G. Taft, Assist. Dist. Atty., Robert A. Huttash, Houston, State's Atty., Austin, for the State.

*OPINION ON APPELLANT'S PETITION
FOR DISCRETIONARY REVIEW*

CLINTON, Judge.

Appellant was convicted by a jury of the offense of murder under V.T.C.A. Penal Code, § 19.02(a)(2). The jury assessed his punishment at 75 years confinement in the penitentiary. On appeal he argued, *inter alia*, that though the trial court had instructed the jury on the lesser included offense of involuntary manslaughter, it erred in failing also to instruct it on the lesser included offense of negligent homicide. The court of appeals disagreed, holding the evidence did not raise negligent homicide, and affirmed appellant's conviction. *Saunders v. State*, 780 S.W.2d 471, 475 (Tex.App.—Corpus Christi, 1989). Appellant then filed a petition for discretionary review, contending that the court of appeals erred to hold the evidence did not raise negligent homicide. We agreed, and remanded the case to the court of appeals to conduct a harm analysis in the first instance. *Saunders v. State*, 840 S.W.2d 390 (Tex.Cr.App.1992).

On remand, the court of appeals held that failure of the trial court to submit the lesser included offense of negligent homicide did not cause "some" harm to appellant, under *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr. App.1984) and *Arline v. State*, 721 S.W.2d 348 (Tex.Cr.App.1986). The jury in this cause was authorized to convict appellant for the lesser included offense of involuntary manslaughter. In final argument counsel for appellant attempted to persuade the jury to find he had not committed an act clearly dangerous to human life intending to cause serious bodily injury, as called for under § 19.02(a)(2), but had simply acted with conscious disregard for the substantial and unjustified risk that death would result. V.T.C.A. Penal Code, § 6.03(c). The only difference between involuntary manslaughter and negligent homicide is perception of the risk; in the former, that actor recognizes the risk of death and consciously disregards it, while in the latter he is not, but ought to be, aware of the risk that death will result from his conduct. V.T.C.A. Penal Code,

§ 6.03(d). The court of appeals essentially reasoned that, having rejected the lesser included offense of involuntary manslaughter and convicted appellant instead of murder, appellant's jury would not have reached an instruction on negligent homicide even had one been submitted. Thus, appellant suffered no harm even under the lesser standard of "some" harm articulated in *Arline v. State,* supra. The court of appeals again affirmed the conviction. *Saunders v. State,* 871 S.W.2d 920 (Tex.App.—Corpus Christi 1994). We granted appellant's second petition for discretionary review in order more closely to examine its harm analysis. See Tex.R.App.Pro., Rule 200(c)(3).

## I.

The indictment alleged that appellant, on or about October 17, 1987, murdered Darrell McFadden, a five month old infant; specifically that, with intent to cause serious bodily injury, he committed an act clearly dangerous to human life, *viz:* squeezing the baby's head with his hand, that caused Darrell's death. § 19.02(a)(2), supra.[1] We have summarized the evidence of the case before, as has the court of appeals in several opinions. Nevertheless, we will repeat the facts here in somewhat greater detail in order to facilitate our review of the court of appeals' harm analysis.

Several months after her illegitimate baby, Darrell, was born in May of 1987, twenty-one year old Reba Annette McFadden went to live with her friend, Carolyn Campise, and with Carolyn's mother, Precilla, in Humble. While living with the Campises, McFadden took care of the baby only when neither Carolyn nor Precilla was home. In early September, McFadden and the baby moved into an apartment with seventeen year old appellant in Pasadena. One day about a week later during a visit to McFadden's new apartment, the Campises noticed bruises on Darrell's face. Precilla took Darrell home to babysit him overnight, since McFadden was scheduled to resume her night-shift job that night. But appellant and McFadden later

came and fetched Darrell back. Appellant insisted he would take care of the baby. When in mid-September the Campises again visited, the baby seemed "fine." But when Carolyn complained that appellant's dog was jumping on Darrell and scratching him, McFadden, a normally shy and quiet girl, ordered her, "Get your ass out of my house and don't come back. This is my baby. I'll do with it what I want with him." The Campises visited a third time on September 22nd. This time they noticed some small sores below Darrell's nose and on one ear. When Carolyn complained that "someone had hurt the baby," appellant answered "something like, give me a break or, you know, give me more credit than that, sort of stating that he hadn't done it."

On October 2, 1987, appellant and McFadden took Darrell with them to buy a vacuum cleaner at a Highland Super Store. Appellant held the baby. Once they decided on a purchase, appellant took the baby, who was crying, to a counter and sat him up there. Various Highland employees watched with trepidation as appellant proceeded to hold his hand "with a firm grip" over Darrell's mouth and nose, to shake him, to squeeze his abdomen, squeeze his neck, and squeeze his head. All the while appellant was heard to say, "God damn it. Shut up, you little motherfucker. Shut up, shut up."—or words to that effect. Darrell had an abrasion under his left eye, and blood was crusted under his nose. Out of concern, one salesman approached appellant to comment "what a pretty little baby" he had, hoping this would deter him, but as soon as the salesman walked away, appellant began to squeeze the baby's head again.

The next day, October 3, appellant and McFadden took Darrell, wrapped in a blanket, to a video store. A registered nurse who happened to be there noticed that Darrell's forehead was swollen and bruised, as was "the jaw area." She opined that the bruises on his forehead were older, because more greenish. The jaw was more black and blue. She also saw two bright red scratches

---

1. V.T.C.A. Penal Code, § 1.07 defines "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

across the baby's cheeks. Darrell's eyes were wide and glassy, and there was "no muscular movement of any facial muscles." She could perceive no "response to any stimulus whatsoever." The nurse testified that in her opinion "the baby needed some type of medical attention." McFadden was holding Darrell, and she told him, "I wish you would stop."

A week later, on October 10, a gun shop employee saw appellant and McFadden come into the shop with Darrell. As they browsed, the employee, who took a particular interest in Darrell because he had an infant child himself, noticed that the baby seemed "bundled up pretty well"—in fact, "over clothed for the day." Darrell also had socks pulled over his hands. Darrell's face looked discolored and distorted, and his head was swollen. Nevertheless, the baby smiled at him, and "still had the gleam of a child." The gun shop employee asked the couple, "What happened to your baby?" Appellant explained that Darrell had "hit himself on the coffee table." Then appellant and McFadden looked at each other and "their expression changed." They hurried out of the gun shop.

A neighbor testified that after appellant and McFadden moved into their apartment, he and his wife would hear the baby cry some nights for as long as an hour and a half to two hours, sometimes muffled by loud music. From time to time a male voice was heard to say, "Can't you get that baby to be quiet? Can't you get that baby to shut up?" In late September or early October, the neighbor overheard a conversation between appellant and McFadden in the parking lot, as McFadden was apparently securing Darrell in a car seat. Appellant was in a "bending posture" beside her. McFadden admonished him to "stop it." Appellant complained, "Well, he's always crying. Why is he always crying?" According to the neighbor, McFadden responded, " 'He's a baby. He's going to cry,' and then, 'Stop it' again." Darrell was not crying at the time. The baby's crying had stopped altogether by about October 10th, a week before his death.

At about 7:30 a.m. on the morning of October 17, 1987, the police were called to the apartment. McFadden had come home from work and found Darrell dead in his crib. Judging by the lividity pattern in the body, Darrell had apparently been turned over from his stomach to his back before the police arrived. Appellant told police he had given Darrell some water around 11:00 p.m. the night before and then gone to sleep. McFadden woke him the next morning with the news. To police, McFadden seemed unemotional; appellant, on the other hand, had apparently been crying. When they turned Darrell's body back over, police discovered an ulcerated sore about the size of a silver dollar on the back of his head. Appellant told the police the ulceration was a bedsore. A first aid kit was found in the bedroom, and an empty bottle of hydrogen peroxide was discovered in the trash. After discovering the ulcer, the police decided to arrest appellant and McFadden.

Appellant gave the police two statements. In the first he admitted that about a week before he had hit Darrell "lightly on the back of the head" to keep him awake, so that he would sleep later and not keep appellant awake. He had also watched Darrell fall against the coffee table. Although Darrell had not seemed hurt at the time, appellant speculated this might have caused the ulceration. He also stated: "I did not hate that kid. There were three things that I did not like about that kid. One was that it was not my kid. Two, I did not like it's daddy, and 3, it woke me up in the mornings." The record does not reveal the identity of Darrell's father.

The next day appellant gave a second statement. He admitted that in his first statement he did not give a true account of "how [Darrell] got hurt." About a week and a half before, according to the second statement, Darrell had fallen off of the kitchen counter. At first he had a bruise on the back of his head, but this soon developed into a small hole. Every day the hole grew larger. Darrell became weak and sick, and soon could not hold his head up. All he did was sleep. Appellant and McFadden were afraid to take him to the hospital because they "were both scared about what they would say about the hole," and they decided to "wait for

[it] to clear up." As it turns out, Darrell's death was not related to the ulceration.

The medical examiner cataloged Darrell's injuries at the time of death. Besides the ulceration, he had abrasions on his nose and ears that were probably a result of pinching, and an ulceration of the frenulum (membrane between the upper lip and gum) likely caused by pinching or forceful slapping. The ulceration on the head appeared to have been cleaned with something, "probably hydrogen peroxide." This injury might have occurred as appellant had claimed in his second statement, but it was *not* a bedsore, as he originally told police. Darrell also had bruises all the way around his chin that were "a couple of days old," and not likely to have resulted from a fall from a counter—the configuration of the bruises was not right for that. There were also bruises up and down the baby's spine that were "more than three days old." These could have been caused by a fall from a countertop, but were more likely the result of blows with a hand or object, because normal reaction to a fall would not have exposed the parts of the back that were injured.

None of these injuries was fatal. Darrell had sustained two fatal injuries, however. One was a subdural hemorrhage, mostly to the left side of his head, where the autopsy revealed a half cup of accumulated blood. Although a "sudden blow" could have caused this injury, nothing in the autopsy suggested such an explanation. Instead, the examiner opined, "more shaking than anything else" is what likely caused the subdural hemorrhage—a shaking like the one some of the Highland employees had seen appellant give Darrell on October 2nd. Moreover, there was evidence that this injury was of both recent and remote origin; both "old bleeding, and ... new bleeding." Symptomatically, the baby probably suffered headaches, and then drowsiness with the buildup of blood. As the brain acclimated to the pressure, the baby would have begun to act normally again. As more bleeding occurred later, however, the listlessness could return. The examiner testified:

"Q Now, if the child is motionless with his eyes an [sic] motionless with regard to his face muscles, making no responses whatsoever and simply hanging listlessly like a rag doll, would those external signs indicate that the child may be suffering from a subdural hemorrhage at that time?

A Yes, ma'am.

Q And then if the pressure in the brain adjusts as you described, would it then be possible for a child, let us say a week later to be able to smile at somebody and to respond?

A Yes, ma'am.

Q And then might the bleeding again begin and then the child go back into this listless state?

A Yes.

Q Is it possible that this bleeding had been going on ever since 15 days before death?

A Yes.

Q Could have been bleeding on and off and on and off?

A Yes, ma'am.

Q During the last three days of life, is it possible that the child was, or such a bleeding, might have been too weak to hold up its head?

A Yes.

Q Is it possible that he might have been too weak to cry?

A Yes, ma'am."

Without treatment, Darrell would have died eventually from this injury.

The immediate cause of death, however, was multiple fractures of the skull. These were inflicted, at most, three to four hours before death. Bruising on the baby's head (apparently in the rough shape of a hand) that corresponded to location of the fractures led the medical examiner to conclude that the fractures were caused by manual squeezing of the head. He found no laceration of the scalp, as would be expected from a blow to the head; nor did he find evidence of "countercue," as he would have expected had the baby's head hit the floor, or if a blunt object had been used. It does not take much pressure to crack a baby's thin skull, he testified, and it would not have made any noise. Needless to say, the fractures constituted "serious bodily injury, something which

caused death or created a substantial risk of death." Moreover, squeezing a baby's head "as was done here" was, in the medical examiner's estimation, an act clearly dangerous to human life.

At the beginning of her final summation the prosecutor reminded the jury that during voir dire they had discussed lesser included offenses. With respect to those she told the jury:

"The offense of negligent homicide which we discussed does not appear in the charge. It was not raised by the evidence. But the offense of voluntary manslaughter must be placed in the charge even if there is a tiny bit. The Courts call it a scintilla of evidence in the case and therefore must be in the charge for your consideration."

She argued that the jury should reject involuntary manslaughter because:

"[w]hen a baby is squeezed on the back of the head, there is no other purpose to that except to cause trauma. You might be able to argue that he smothered the child because he wanted him to quit crying or you might be able to argue that he shook the child because he wanted to stop the child's behavior. But there is no reason to squeeze on the back of a child's head except to commit an act clearly dangerous to human life."

Appellant's counsel countered that "[t]he evidence really indicated that the motive was to stop crying, not to cause serious bodily injury, to stop crying." He also contended that appellant's demeanor and cooperation with the police were inconsistent with a conclusion that he had intended to cause serious bodily injury. He urged the jury not to mistake appellant's ineptitude with the child as evidence of an intent to seriously injure him.

The prosecutor responded:

"I only have one thing to say to you with regard to the lesser included offense of involuntary manslaughter and that is that if you find that squeezing a child's head to the point that it cracks a skull is only a reckless act and not an intentional act, then God help the children of Harris County. And if it comes down to that, let him go and acquit him. If you can't find him guilty of murder, don't find him guilty of that.

"I suggest if it's—if it's not an intentional act, it's not a reckless act."

Appellant's objection that this last comment was a "personal comment" was sustained, but he did not ask for an instruction for the jury to disregard it.

## II.

On this record we held that negligent homicide was raised, and remanded the cause to the court of appeals for a harm analysis. *Saunders v. State*, 840 S.W.2d at 392. In his second petition for discretionary review, appellant now argues that in order to establish "some" harm, he need show no more than that the evidence raised the lesser included offense, and that the jury was not allowed to consider it in its deliberations. It is true that in past practice we have found "some" harm under *Arline* any time the evidence raised one lesser included offense which the trial court refused to submit to the jury. But we have never addressed the specific question whether a jury's failure to convict for a lesser included offense that *was* included in the jury charge can render error in not authorizing the jury to convict for *another* lesser included offense harmless. This is essentially a question of first impression.

The question is not, however, without analogues in the law. The court of appeals' analysis in this cause is reminiscent of the way this Court has treated past claims, not of the failure of the trial court to submit a lesser included offense instructions altogether, but of a defect in a lesser included offense instruction that the trial court did submit. In that context we have held that conviction for the greater inclusive offense nullifies any possible harm that might have derived from the defective lesser included offense instruction.

For example, in *DeRusse v. State*, 579 S.W.2d 224 (Tex.Cr.App.1979), the defendant was convicted of murder. DeRusse complained on appeal that the trial court erred in submitting the lesser included offense of injury to a child, a charge that had been alleged in an alternative count in the indictment, but later abandoned by the State. A

panel of the Court held that it did not need to resolve whether it had been error to charge on the lesser included offense, since conviction of the greater offense made the question essentially academic. *Id.*, at 233. And in *O'Pry v. State*, 642 S.W.2d 748 (Tex. Cr.App.1981) (Opinion on rehearing), the defendant complained that his objection at trial to the submission of a lesser included offense not authorized by the indictment should have been sustained. Acknowledging that, unlike *DeRusse*, O'Pry did not have to allege fundamental error, the en banc Court nevertheless held that, because the jury had convicted of the greater offense, the error, if any, was not reversible—presumably because we perceived no harm. *Id.*, at 765 & n. 11.

In *Thomas v. State*, 587 S.W.2d 707 (Tex. Cr.App.1979), the defendant contended that the lesser included offense instruction was fundamentally erroneous in that it did not contain every requisite element of the lesser offense. Another Court panel observed that fundamental defects are measured by the application paragraph for the offense of which the defendant was convicted. Because Thomas was convicted of the greater offense, the jury was not misled and there was no fundamental error. *Id.*, at 708–709. To the same effect was our en banc holding in *Garrett v. State*, 642 S.W.2d 779, at 781 (Tex.Cr. App.1982).

Of course these decisions all preceded *Almanza* and *Arline*. In a subsequent case, however, we endorsed this mode of analysis under *Almanza*. The defendant in *Clark v. State*, 717 S.W.2d 910 (Tex.Cr.App.1986), argued that the instruction on the lesser included offense of murder that the trial court submitted to the jury was fundamentally defective in that it failed to require the jury to find a culpable mental state. On the strength of the opinions in *Thomas* and *O'Pry*, the Court held that any error in the lesser included offense instruction was not fundamental in view of the fact that the jury convicted Clark of the greater offense of capital murder. *Id.*, at 918; see also *id.*, at 921 (Clinton, J., concurring) ("there are some flagrant errors so patently *not* calculated to injure the rights of an accused that much of an *Almanza* review becomes redundant").

■ Can it be said, in a similar vein, that failure of the jury to convict an accused of one lesser included offense can conclusively establish that the trial court's error in denying a valid request for an instruction on another lesser included offense did not engender "some" harm? At least one other court of appeals has held the presence of an intervening lesser included offense in the jury instruction upon which the jury does not choose to convict does establish harmlessness. In *McCloud v. State*, 692 S.W.2d 580 (Tex.App.—Houston [1st] 1985, no pet.), the defendant was indicted for the offense of attempted capital murder, but convicted of the lesser included offense of attempted murder. The trial court also permitted the jury to convict McCloud for the lesser included offense of aggravated assault, but refused his requested instruction on reckless conduct. The court of appeals held that the trial court erred not to give the instruction, but found the error harmless under *Almanza*. Had the jury entertained a reasonable doubt that McCloud had harbored a specific intent to kill, reasoned the court of appeals, it would have convicted him of no more than aggravated assault. Because the jury did not convict him of *that* lesser included offense, the court of appeals concluded, it would not have reached the lesser-lesser included offense of reckless conduct either, even had it been submitted. The court of appeals in this cause reasoned in much the same way.

Another court of appeals, however, has declined to follow the lead of *McCloud*. In *Gonzalez v. State*, 733 S.W.2d 589 (Tex. App.—San Antonio 1987), the defendant was convicted of voluntary manslaughter. The trial court also authorized the jury to convict him of the lesser included offenses of involuntary manslaughter and negligent homicide, but refused to submit aggravated assault over his objection. The court of appeals noted *McCloud*, but refused to follow it, believing it had been rejected by this Court in *Moreno v. State*, 702 S.W.2d 636 (Tex.Cr. App.1986). The court of appeals also declined to analogize to *Clark* and *Thomas*, observing that in those cases a lesser included offense instruction had been given, however flawed, and thus "the jury was at least

aware that it had an alternative to convicting for the greater offense." *Gonzalez,* supra at 591. Ultimately the court of appeals opined:

"To say that conviction of a greater offense precludes the harm created by omitting the charge on a lesser included offense ignores the fact that the jury was denied the opportunity to consider the entire range of offenses presented by the evidence. In this case, refusal to charge on aggravated assault limited the jury to three rather than four possible choices other than acquittal. Since the jury is required to consider the entire charge, this omission resulted in an unfair trial."

*Id.* In essence the *Gonzalez* court of appeals seems to have held that failure to submit a lesser included offense instruction when the evidence justifies it will always amount to at least "some" harm under *Almanza/Arline,* whether other lesser included offense instructions are submitted or not.[2]

Like the court of appeals in *Gonzalez,* appellant relies upon cases from this Court in which we have consistently found "some" harm in the failure of the trial court to charge on a lesser included offense simply by virtue of the fact that this error kept the jury from considering whether the defendant may have been guilty of that lesser offense. Appellant argues that this view of harm is consistent with the position taken by the United States Supreme Court in *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In *Beck* the Supreme Court acknowledged the possibility that a jury, believing

the defendant to have committed some crime, but given only the option to convict him of a greater offense, may have chosen to find him guilty of that greater offense, rather than to acquit him altogether, even though it had a reasonable doubt he really committed the greater offense. *Id.,* 447 U.S. at 634, 100 S.Ct. at 2388, 65 L.Ed.2d at 401.

It is true that, without specifically articulating this as the rationale, we have routinely found "some" harm, and therefore reversed, whenever the trial court has failed to submit a lesser included offense that was requested and raised by the evidence—at least where that failure left the jury with the sole option either to convict the defendant of the greater offense or to acquit him. E.g., *Moreno v. State,* supra at 641; *Gibson v. State,* 726 S.W.2d 129, 133 (Tex.Cr.App.1987); *Hayes v. State,* 728 S.W.2d 804, 810 (Tex.Cr.App.1987); *Mitchell v. State,* 807 S.W.2d 740, 742 (Tex. Cr.App.1991).[3] In each of these cases we essentially recognized that "some" harm occurs because the jury was not permitted to fulfill its role as factfinder to resolve the factual dispute whether the defendant committed the greater or lesser offense. That the evidence the defendant was "guilty only" of the lesser included offense may not have been compelling was no more a consideration in our analysis of harm than it was in deciding that the trial court erred in failing to give the instruction in the first place. Given the rationale of *Beck,* this is hardly an inappropriate criterion for assessing harm.

**2.** This Court granted the State's petition for discretionary review in *Gonzalez,* but later dismissed it as improvidently granted. Judge W.C. Davis dissented to the dismissal, joined by two other judges, but not for reasons pertaining to the court of appeals' harm analysis. See *Gonzales [sic] v. State,* 762 S.W.2d 583 (Tex.Cr.App. 1988).

**3.** The dissent criticizes us for importing the rationale of *Beck v. Alabama* into a line of cases that does not expressly invoke it. But it is appellant himself who invites us to explain the holding of *Moreno et al* in light of *Beck.* We think this is appropriate, for absent the reasoning that underlies *Beck,* there could be no inference of harm at all in the failure of the trial court to give a lesser included offense instruction. The reason is simple. Ordinarily an appellate court must presume that a jury has followed the trial court's instruc-

tions to the letter. Entertaining this appellate presumption, we would regard a guilty verdict on the greater inclusive offense to be conclusive evidence that the jury was in fact convinced beyond a reasonable doubt that the defendant committed that greater offense. In that event, we could say with certainty that the jury would not have returned a guilty verdict for a lesser included offense even had the evidence supported it and the trial court authorized conviction for that offense. Any error in failing to give the lesser included offense instruction would be absolutely harmless. Only by entertaining a *Beck*-like rationale are we able to reverse the ordinary appellate presumption, and hold that the failure to authorize conviction for the lesser included offense is reversible error *despite* the jury's verdict of guilty for the greater inclusive offense. If our opinions in *Moreno et al* are not grounded in *Beck,* they have no grounding at all.

But in none of these cases did the trial court, as here, agree to submit one lesser included offense raised by the evidence, but decline to submit another that the evidence also raised. Here the jury's options were not limited to conviction of the greater offense or acquittal. Under these circumstances the *Beck* risk that the jury will convict of the greater offense despite its reasonable doubt is not so apparent. There is an available compromise. It is at least arguable that a jury that believed the defendant committed an uncharged lesser included offense, but unwilling to acquit him of all wrongdoing, and therefore inclined to compromise, would opt for a lesser included offense that *was* submitted rather than convict him of the greater offense. That the jury here did *not* may thus indicate that the sort of "harm" contemplated by *Beck* did not occur in this cause. For this reason we cannot quite so readily regard the harm in failing to submit the lesser included offense as self-evident, as we did in *Moreno, Gibson, Hayes* and *Mitchell,* and as the court of appeals did in *Gonzalez.*

In short, we cannot say that the court of appeals clearly erred in this cause to push beyond the simple fact that the evidence raised the lesser included offense of negligent homicide in deciding whether failure to give that instruction amounted to "some" harm under the standard of *Almanza* and *Arline.* It was not inappropriate—and certainly not inconsistent with *Almanza*—for the court of appeals to have considered the circumstance that the jury was authorized to convict appellant of the lesser included offense of involuntary manslaughter, but chose not to, as some indication that lack of a negligent homicide instruction did not harm him at all. This is not to detract from the Court's holdings in *Mitchell,* et al., that where the jury's only options are to convict for the greater offense or acquit, the fact that a lesser included offense is raised by the evidence but not included in the jury instructions will be sufficient to demonstrate "some" harm. We simply hold that those cases do not fully control here.

### III.

Even so, appellant maintains that he suffered some harm in the instant cause. He contends that the fact that the jury was authorized to convict him for reckless homicide, but chose not to, is *not* a conclusive indication that he suffered no harm from the lack of a charge on negligent homicide, given the particular facts of this case. We agree with appellant that it is not invariably true that the jury's rejection of one lesser included offense will render harmless the trial court's failure to authorize the jury to convict of another lesser included offense also raised by the evidence. On the particular facts of this case, however, we ultimately agree with the court of appeals that it was harmless error not to have instructed the jury it could convict appellant of negligent homicide, for reasons about to be given.

Negligent homicide is a lesser included offense of involuntary manslaughter by the terms of Article 37.09(3), V.A.C.C.P., in the sense that "it differs from [that] offense only in the respect that a less culpable mental state suffices to establish its commission." Of course, in this same sense both involuntary manslaughter and negligent homicide are lesser included offenses of murder. But it is important to recognize that involuntary manslaughter and negligent homicide are mutually exclusive lesser included offenses of murder. Both require the existence of conduct that creates a substantial and unjustifiable risk of death. But in the former, the accused must be aware of the risk, and consciously disregard it. In the latter it must be found that, though he ought to have been aware of the risk, he was not. Thus, a guilty verdict on a charge of involuntary manslaughter only artificially "includes" a verdict of negligent homicide, by operation of Article 37.09(3). See also V.T.C.A. Penal Code, § 6.02(e) ("Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged.") In actuality, involuntary manslaughter negates negligent homicide, inasmuch as it entails a finding that the defendant was aware of the risk. In this sense involuntary manslaughter and negligent homicide are mutually exclusive,

alternative lesser included offenses of murder.

In some cases, the evidence relevant to the culpable mental state of the defendant at the time of the homicide will give rise to more than one inference. Indeed, in this very case we have already held that the evidence as to appellant's intent at the time of the conduct which caused death "is subject to different interpretations." *Saunders v. State,* 840 S.W.2d at 392. On the facts of this case the jury could rationally find appellant was "guilty only of" *either* murder *or* involuntary manslaughter *or* negligent homicide. It would be rational, moreover, on such a state of the evidence, for a jury to decide it did not accept the inference of recklessness, and that it must therefore choose between the competing inferences that remain, *viz:* whether appellant harbored a specific intent to cause serious bodily injury, or he harbored no such intent and simply did not realize the substantial and unjustifiable risk his conduct generated. The jury *might* believe, to restate it in terms of the instant case, that no one would squeeze a baby's head as appellant did with reckless disregard for the consequence; that his conduct was such that he must either have specifically intended to cause serious injury or else he had a different intent altogether (e.g., to discipline or silence the baby), and stupidly did not realize the harm he was causing.

A jury that believes these are the inferences best supported by the facts will not necessarily be predisposed to convict for involuntary manslaughter as a compromise. Given a choice to convict for murder (specific intent to cause serious bodily injury), or for involuntary manslaughter (conscious disregard of risk), or to acquit, but not to convict for negligent homicide (failure to perceive risk), a jury that has construed the evidence to rule out conscious disregard of risk will not necessarily convict of involuntary manslaughter anyway when it cannot decide whether the defendant's conduct was intentional or just grossly imperceptive. Absent the negligent homicide option, such a jury might well resolve its indecision in favor of a conviction for murder because it finds conscious disregard of risk to be the *least* plausi-

ble theory under the evidence, and thus cannot bring itself to convict for involuntary manslaughter—but cannot bring itself to acquit the defendant either! Thus, conviction for murder instead of the lesser included offense of involuntary manslaughter does not establish, *a fortiori,* that a jury authorized to convict for negligent homicide would not have convicted for that lesser included offense instead of murder.

Moreover, such a jury may find itself facing the same basic dilemma as the jury in *Beck:* whether to convict on the greater inclusive offense about which it harbors a reasonable doubt, or to acquit a defendant it does not believe to be wholly innocent. The existence of this dilemma has been enough to convince us that failure to give a lone lesser included offense instruction upon request amounts to "some" error under *Arline.* See *Moreno, Gibson, Hayes* and *Mitchell,* all supra. It remains to decide, on the facts of the instant case, whether there is a "realistic probability" that the jury could have found itself in this dilemma. See *Black v. State,* 723 S.W.2d 674, 675, n. 2 (Tex.Cr.App.1986). That is to say, does the record in the instant cause admit of a "realistic probability" that the jury's decision was reduced to whether appellant intended to cause serious bodily injury or simply did not perceive the obvious risk his conduct was creating? If so, then the failure to instruct the jury on negligent homicide despite appellant's request was harmful, notwithstanding that the jury did not convict him of involuntary manslaughter.

### IV.

We conclude that, given the evidence in this cause, the "realistic probability" is that, even had the jury also been instructed on negligent homicide, it would have found itself debating whether appellant specifically intended to seriously injure, or whether he was aware of, but indifferent to, the danger. It is true that appellant was only seventeen years old at the time of the instant offense. There is certainly some evidence to suggest that his conscious objective was only to quiet Darrell, and that in his callowness he simply did not realize the danger his conduct posed. But on the record before us it is far more likely that

the jury's real decision was reduced to whether appellant's conscious objective was to cause serious bodily injury, or instead, only to silence the baby, though he was conscious of the risk of death.

Appellant could hardly have been unaware of the nature and extent of Darrell's injuries, and of Darrell's apparent stupor in the video store on October 3rd, following the abuse he took in the Highland Super Store. Appellant had reason to know that squeezing Darrell's head the first time had been injurious. That in fact he likely did realize how badly the baby was hurt is apparent from his guilty demeanor a week later in the gun shop, and his hesitation to seek medical help even once he realized Darrell was sick. The evidence strongly suggests that, if it was not appellant's conscious objective to cause serious bodily injury, including death, he was at least aware of that risk.

For this reason we can say with confidence that the jury gave more than passing credence to the instruction that it *was* given on the lesser included offense of involuntary manslaughter. Thus, if the jury had harbored a reasonable doubt whether appellant specifically intended to cause serious bodily injury, it would not likely have convicted appellant of murder anyway for lack of an acceptable compromise. We do not think that the *Beck* danger—that the jury would convict of the greater inclusive offense because its only viable alternative was to acquit—is present in this cause.[4] It is more likely the jury convicted appellant of murder because it legitimately believed his true intent had been indeed to cause serious bodily injury. After all, the only other conscious objective that the evidence specifically suggests, *viz:* that when appellant squeezed Darrell's head on October 17th (or the night

before), he simply meant to stop his crying, is ultimately unpersuasive. Even by appellant's own account, Darrell was probably too sick to cry at that time, and in fact had not been heard to cry for a week.

■ On the particular facts of this case, then, we agree with the court of appeals' ultimate conclusion. That is to say, on the particular facts of this case we agree that because the jury did not opt to convict appellant of involuntary manslaughter, failure to authorize conviction for negligent homicide was harmless under *Almanza* and *Arline*. We reemphasize, however, that this is not an *a fortiori* conclusion, as the court of appeals apparently believed. Failure to convict of one lesser included offense will not invariably render harmless any error in refusing to submit another lesser included offense that is also raised by the evidence. As with any purported errors in the jury charge, "harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza,* supra, at 171.

The judgment of the court of appeals is affirmed.

MALONEY, Judge, *dissenting.*

I dissent to the majority's holding that it was harmless error not to submit to the jury the lesser included offense of criminally negligent homicide.

### I.

In order to reach its conclusion, the majority was compelled to distinguish a line of

---

4. It is true that in her final summation the prosecutor invited the jury to acquit appellant altogether rather than convict him only of involuntary manslaughter. Had the evidence of involuntary manslaughter been negligible in this cause, we might be inclined to view this argument as an attempt to pressure the jury to ignore its reasonable doubt and convict for the greater offense of murder simply because it had no attractive alternative. In that event we would consider the argument supportive of a claim that failure to instruct the jury on negligent homicide was harmful. But on the facts of

this case, the prosecutor's rhetorical flourish really served to emphasize for the jury that the biggest issue raised by the evidence was whether appellant specifically intended to cause serious bodily injury or, with some other conscious objective in mind, simply ignored the risk of death. The prosecutor was essentially asking the jury to acquit rather than to reach a compromise verdict. While still a transparent effort to persuade the jury to reach a guilty verdict for murder, under the circumstances of this case the prosecutor's argument hardly invited the same dilemma as that presented in *Beck*.

cases that indicate otherwise. I am not satisfied that the majority has convincingly distinguished those cases, and I find them controlling of the issue presented.

In *Moreno v. State,* 702 S.W.2d 636, 640 (Tex.Crim.App.1986), a burglary of a habitation case, we held that the trial court erred in failing to instruct the jury on the lesser included offense of criminal trespass. Addressing whether there was *some* harm under *Almanza* as a result of the error, we said:

> Here, the appellant timely objected and as well filed a special requested charge on criminal trespass, which means there was *some* harm from the error. It might well be argued that the jury charge as given amply protected appellant's rights, but the issue of intent to commit a felony or theft was for the jury. In a burglary prosecution the specific intent to steal or commit theft may be inferred from the circumstances, [citations omitted] but the lack of intent may also be inferred from the circumstances. The jury is empowered to determine the issue of intent. [citations omitted] The issue is not whether appellant's is true or even believable. That issue is exclusively for the jury as the trier of the facts.

> We conclude that the error was harmful under the circumstances applying the test of *Almanza.*

*Id.* at 641. In *Gibson v. State,* 726 S.W.2d 129 (Tex.Crim.App.1987), we held the trial court erred in refusing the defendant's requested instruction on the lesser included offense of involuntary manslaughter. We assessed the harm issue under *Almanza:*

> In the instant case the error was properly preserved by appellant's timely requested jury instruction. Therefore, *any* harm resulting to appellant will require a reversal. There is evidence in the case raising the lesser included offense of involuntary manslaughter and the jury should have been afforded the opportunity to decide whether the offense committed by appellant constituted involuntary manslaughter, a third degree felony, rather than murder, a first degree felony. Because the jury

was not given this opportunity we cannot say that no harm resulted to appellant. *Id.* at 133. Likewise, in *Hayes v. State,* 728 S.W.2d 804 (Tex.Crim.App.1987), we held the trial court erred in failing to instruct the jury on a lesser included offense. Applying virtually the same rationale articulated in *Gibson,* the Court again concluded there was *some* harm:

> ... it has been made clear that the evidence presented at least raised the lesser included offense of reckless conduct. The jury should have been afforded the opportunity to decide whether the offense committed by appellant constituted reckless conduct, a Class B misdemeanor, rather than aggravated assault, a third degree felony. Because the jury was not given this opportunity we cannot say that *no* harm resulted to appellant.

*Id.* at 810. Consistently, in *Mitchell v. State,* 807 S.W.2d 740 (Tex.Crim.App.1991), where we held the trial court erred in failing to charge on a lesser included offense, we again concluded that there was some harm:

> The appellant was clearly harmed in this case because the jury was not allowed to consider the lesser included offense of criminal trespass in conjunction with the charge of burglary of a habitation.

*Id.* at 742.

In all of these cases the Court held that the fact that the jury was not given the opportunity to consider whether the defendant was guilty of the lesser included offense rather than the greater offense supplied *some* harm. The majority distinguishes these cases by assuming that their underlying rationale was that of the Supreme Court in *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In *Beck,* the Supreme Court held that a capital murder defendant was entitled to a charge on the lesser included offense of felony murder. The Court reasoned that when the evidence establishes that the defendant is guilty of *some* offense, but is questionable as to an element of the capital offense, failure to give the jury the option of convicting the defendant of a lesser included offense "enhance[s] the risk of an unwarranted conviction" for the capital offense. *Beck,* 447 U.S. at 637,

100 S.Ct. at 2389. Faced only with the options of either convicting of capital murder or acquitting altogether the jury might opt to convict even if they have some doubt as to an element. By imparting the *Beck* rationale to the *Moreno* cases, the majority reasons that in the instant case the *Beck* risk is not so apparent since the jury was provided at least one lesser included offense as an alternative to conviction of murder. *Majority op.* at 572.

The problem with imparting the *Beck* rationale to the *Moreno* line of cases is that those cases do not espouse the *Beck* rationale, give any indication that they are relying upon *Beck*, or even cite to *Beck*. They simply recognize that the jury should be given

the opportunity to consider the lesser included offense and the failure to provide that opportunity, when raised by the evidence, amounts to some harm. Under the *Moreno* cases, since there is no way of knowing how a jury would view any given issue in the context of the other issues, the fact that the jury was precluded from considering an issue amounts to some harm.[1] The inclusion of another lesser included offense does not affect that reasoning.[2]

## II.

I also dissent to the majority's opinion because it utilizes a new standard for evaluating *some* harm under *Almanza* without adequately identifying its source or explaining how its application differs from the evalu-

---

1. Appellant ably argues that the absence of the instruction on the lesser offense necessarily changed the perspective with which the jury viewed the offense:

    ... the absence of criminally negligent homicide was emphasized in argument and was made a factor in their consideration of the greater offense. The prosecutor had informed jurors during voir dire of the full range of homicide crimes, including the fact that criminally negligent homicide was a misdemeanor with a maximum punishment of a year in the county jail and a fine. She told them even "a shred" of evidence would require submission of the offense as a lesser included offense in the charge. Necessarily, then, the absence of that offense from the charge told the jurors the case had proven to be more serious than it might have been. They actually began deliberations with a perspective that was more prejudicial to Appellant than the view they would have had if criminal negligent homicide had been included in the charge. Why else, of course, would the prosecutor remind them in closing argument that they had discussed the possibility of lesser offenses which were "less serious than murder" and that "(t)he offense of negligent homicide which we discussed does not appear in the charge. It was not raised by the evidence." ...

    If a jury is given three possibilities from which to choose, the very giving of the charge tells them each possibility was raised by the evidence and tells them they may "legitimately" find the accused guilty of any one of the three. It certainly would have changed the way in which the case was presented in argument. Simply knowing that the evidence warranted a finding that Appellant was guilty only of a misdemeanor would logically have changed the context in which the jurors deliberated his guilt.... the very exclusion of the misdemeanor charge from their instructions made it less likely that the jury would feel

mercy was justified; indeed, it was virtually a message to them from the judge, delivered by the prosecutor, that the evidence did not *allow* a conviction for a misdemeanor offense, when actually the evidence would have supported a finding that although an ordinary person would have perceived the risk of death, Appellant failed to perceive that risk.

2. The majority defends its conferring of the *Beck* rationale to the *Moreno* cases by asserting that if the *Moreno* cases are *not* grounded in *Beck*, then "they have no grounding at all." *Majority op.* at 571 n. 3. To the contrary, the *Moreno* cases expressly state their grounding, as is reflected in the portions of the opinions quoted above in this opinion. These cases explain that the fact the lesser included offense was an issue for the jury to decide and the jury was precluded from so considering it amounts to some harm. *Moreno,* supra; *Gibson,* supra; *Hayes,* supra; *Mitchell,* supra (discussed at 575–576 infra). If *Beck* were in some way a part of this rationale, surely the Court would have found it appropriate to at least cite *Beck*, particularly if without *Beck*, its holding would be groundless.

    Further, the Court implies that its imparting of the *Beck* rationale to the *Moreno* cases is somehow obligatory because "it is appellant himself who invites us to explain the holding of *Moreno et al* in light of *Beck*." A review of appellant's brief uncovers no invitation to so "explain" those holdings in light of *Beck*. Rather, appellant is confident of the rationale of the *Moreno* cases and simply construes *Beck* as consistent therewith. Appellant reconciles *Beck* with the *Moreno* cases by explaining:

    ... although in theory the jury will choose rationally among its options, there is a 'substantial risk' that it will not, so that the defendant must be able to provide the jury with every option it *should* have, under the evidence of the case.

ation of egregious harm under *Almanza.* The majority frames the issue of harm in the following terms:

> Does the record in the instant cause admit of a "realistic probability" that the jury's decision was reduced to whether appellant intended to cause serious bodily injury or simply did not perceive the obvious risk his conduct was creating?

*Majority op.* at 573. The majority concludes that this was not a "realistic probability" in light of the evidence.

The majority cites *Black v. State,* 723 S.W.2d 674, 675 n. 2 (Tex.Crim.App.1986), as support for application of the "realistic probability" test. In *Black,* where the trial court erred in failing to instruct on the law of parties, we remanded the case to the Court of Appeals to consider whether the error was harmless in light of *Govan v. State,* 682 S.W.2d 567 (Tex.Crim.App.1985). *Id.* at 676. *Govan* held that the failure to charge on the law of parties may be harmless if the evidence is clearly sufficient to support the defendant's guilt as a principal. Judge Teague dissented and advocated overruling *Govan,* arguing among other things that the jury could have rejected the evidence of the defendant's guilt as a party. The Court responded to Judge Teague's dissent in a footnote, criticizing it for applying "theoretical generalities to all cases rather than realistic probabilities to particular cases." *Id.* at 675 n. 2.[3] I have found no other case utilizing, discussing, or even mentioning the "realistic probabilities" test. This is not to say that such a test might not be appropriate or helpful in conducting a harm analysis under *Almanza.* However, the majority does not provide much insight into how this test applies within the scope of *Almanza.* It does

not appear to me that the Court's application of the "realistic probability" test for determining *some* harm differs in any decipherable way from the analysis that would apply in assessing egregious harm.

For these reasons, I dissent.

BAIRD and OVERSTREET, JJ., join.

---

**3.** The Court further responded to Judge Teague's criticism and explained that its approach was practical rather than theoretical:

> Judge Teague responds that the jury could have rejected whatever evidence might have shown appellant to be guilty as a principal. That argument might be persuasive if the record indicated that the jury had some basis for rejecting the evidence of the appellant's guilt as a principal, i.e., if the State argued that appellant was guilty as a party or if there was conflicting evidence of appellant's guilt as a principal. However, if there was no rational

basis for the jury to reject the evidence of the defendant's guilt as a principal, why should this Court presume the the [sic] jury acted irrationally and unnecessarily relied upon the law of parties? Given the emphasis in *Almanza,* supra, upon actual rather than theoretical harm, the more practical approach of *Govan,* supra, properly presumes that the jury acted rationally and accepted the evidence of the defendant's guilt as a principal, unless the record indicates otherwise.

*Black,* 723 S.W.2d at 676 n. 2.