IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. 74,109






DANIEL CLATE ACKER, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM HOPKINS COUNTY





 Keller, P.J., delivered the opinion of the Court in which MEYERS, HERVEY,
HOLCOMB, and COCHRAN, JJ., joined. PRICE, J. filed a concurring opinion. WOMACK,
JOHNSON and KEASLER, JJ., concurred in the judgment of the Court.


O P I N I O N




 Appellant was convicted of capital murder. (1) Pursuant to the jury's answers to the special issues
set forth in Texas Code of Criminal Procedure, Articles 37.071 §§2(b) and 2(e), the trial judge sentenced
appellant to death. (2) Direct appeal to this Court is automatic. (3) Appellant raises six points of error. We shall
affirm.

A. Background


 The victim, Marquette ("Markie") George, was appellant's girlfriend, but they had a stormy
relationship. On the evening of March 11, 2000, they were with friends and a relative at the Bustin' Loose
nightclub. From a distance, Mary Peugh observed the two of them arguing. After the argument, appellant
walked back to Peugh's table and remarked, "I'm going to kill that bitch." Pointing to the victim, appellant
later told Timothy Mason to tell Markie that appellant was going to kill her. Dorcus Vititow, appellant's
older sister, testified that appellant acted very jealous and was eventually kicked out of the nightclub for
his behavior. Appellant returned several times, inquiring about Markie's whereabouts, and at least one of
those times Vititow told him to stay out of the club. Vititow and appellant left the premises together when
the club closed at 1:00 in the morning. 

 Earlier that night, Vititow had taken a knife away from appellant, and appellant later asked for the
knife to be returned. (4) When appellant asked for the knife to be returned, Vititow claimed (falsely) that she
did not have it. (5) Holding up an axe, appellant responded, "I don't need that knife. If I find her with
another man, they will pay." Later that morning, appellant was still looking for the victim. He believed that
she had spent the night with another man, and he said that, when he found them, he would beat them and
make an example out of them, because no one was going to make a fool out of him.

 At around 9:15 a.m., appellant appeared at the victim's parents' house and asked about the
victim's whereabouts. The victim's mother, Lila Seawright, told appellant that she had not seen her. 
Appellant told Seawright that he did not know what he was going to do without Markie. He further told
her that, if Markie had stayed away by herself that night, then everything was fine, but "if I find out she was
with anybody, I'm going to kill 'em." Shocked, Seawright replied that "there's not anybody worth killing
and going to the pen for." Shrugging his shoulders, appellant responded, "Pen life ain't nothing. Ain't
nothing to it."

 Thomas Smiddy testified that the victim lived in a mobile home within a mobile home park. Smiddy
was one of her neighbors. Between 10:45 and 11:00 a.m., the victim arrived at her home with a man who
was not appellant. This man dropped her off and left. Appellant came out of the home to meet her, and
the two went inside. Twenty to thirty minutes later, Markie ran out of the home and over to Smiddy's
place. She hid behind Smiddy's wife and yelled for them to call the sheriff. Appellant followed and caught
the victim. He picked her up, slung her over his shoulder, and carried her to his pickup truck. He then
forced the victim into the truck - an episode Smiddy described as "like putting a cat in a bathtub." 
Appellant drove away, his truck swerving in and out of a ditch as he did so. Smiddy called the sheriff. (6)

 Sometime between 11:00 and 11:30 a.m., Brodie Young, a sixty-five-year-old man, was driving
on County Road 3519, passing by Sedill Ferrell's dairy, when he saw a man pull a woman by her arms out
of the passenger side of a pickup truck and place her on the ground. Young went to the sheriff's office to
report the incident, but someone had already reported it. 

 Sedill Ferrell found the victim's body lying on the ground. He went to a phone, called law
enforcement, came back to the body, and waited until the authorities arrived. Toney Hurley, the Chief
Investigator for the Hopkins County Sheriff's Office, testified that appellant was found on a road about ten
miles away from the victim's body's location.

 Dr. Morna Gonsoulin, a medical examiner, conducted an autopsy. She testified that she found
injuries around the neck that showed a significant hemorrhage of blood. The left eye contained petechiae
- small hemorrhages in the capillaries lining the eye. Both injuries were a sign of strangulation. She also
found blunt force injuries to the body: The head was crushed, with broken bones in the face. The base of
the skull was shattered on all sides. There were rib fractures and a clavicle fracture, internal injuries to the
trunk, lacerations and gaping wounds to the heart, lacerations of the lung and liver, and a deep laceration
in the lower right leg. The sac around the heart was torn open, a segment of the main artery was torn in
two pieces, and there was blood in the chest and abdominal cavities. There were also abrasions on the
body, including the cheek and chin. This testimony was consistent with the autopsy report, (7) which came
to the following conclusion:

It is our opinion that Marquette George, a 33-year-old white woman, died as the result of
homicidal violence including strangulation. Several of the injuries identified could be
consistent with blunt force injury resulting from an impact with or being ejected from a
motor vehicle. Some injuries (particularly those of the neck and the perineum) are not
consistent with ejection from or impact with a vehicle; the injuries observed in the neck are
more consistent with strangulation. Further, the dry parchment-like appearance of several
abrasions, the lack of associated hemorrhage of the laceration of the right leg, the paucity
of hemorrhage in the brain and the amount of body cavity hemorrhage in relation to the
severity of the injuries indicate that these injuries were sustained postmortem or
perimortem. Given these findings, it is likely that the decedent was strangled and probably
dead or near death prior to being dumped from the vehicle.


On cross-examination, Gonsoulin admitted that crushing the brain stem - which occurred here - was an
injury of the type that would cause instantaneous death by stopping the heart from beating, and thus could
explain the lack of hemorrhaging in other parts of the body. The medical examiner also testified that it was
possible for one to receive the neck injuries observed and survive. On redirect, however, the medical
examiner testified that the neck injuries were so severe that a person suffering from them would have been
incapacitated and might be brain dead, even if the heart were still beating. Gonsoulin also testified that the
neck injuries occurred within hours of the victim's death.

 Appellant testified at trial. He denied strangling the victim and denied squeezing or gripping her
neck. He admitted that he carried the victim to the truck but claimed that she crawled in when he opened
the driver's side door. He further testified that, when he started the truck and began to pull out, the victim
attempted to jump out, but he pulled her back. Later, the victim attempted to jump out a second time but
was prevented from doing so. Appellant testified that the victim finally succeeded on the third attempt to
jump out:

Q. What happened then?


A. At the same time the car passed me she jumped from the pickup.


Q. What happened? What did you do when she jumped?


A. Well, I did three different things pretty much at the same time.


Q. What were those things?


A. I leaned way over and tried to grab her. I barely touched her. I never got a hold to
her. I hollered her name. I hollered Markie as I was trying to grab her and I stomped the
brake with my left foot. As I stomped the brake with my left foot it throwed me down into
the seat of the truck. I raised back up. I took my left foot and pushed the clutch in and
stopped as fast as I could stop.


Q. What happened then?


A. I had to come pretty much to a complete stop to get the truck in reverse.


Q. What happened then?


A. You know any car, I guess, you have to come to a complete stop to get in reverse.


Q. What did you do?


A. I backed up as fast as I could back up.


Appellant further testified that he navigated back to where the victim lay and found her face down on the
ground. He testified that he did not run over her with his truck.

B. Analysis 


1. Videotaped re-enactment


 In point of error two, appellant contends that the trial court erred in admitting for demonstration
purposes a videotaped re-enactment of a witness driving by and viewing someone removing a body from
a pickup truck. In his summary of argument appellant complains that no testimony was offered to
authenticate the videotape and no testimony was offered to show how or when the tape was made or by
whom. Appellant's argument, in its entirety, is as follows:

The admissibility of a videotape is conditioned on its identification by a witness as an
accurate depiction of the event and on verification by a person with knowledge that the
videotape is a correct representation of those facts. Kessler v. Fanning, 953 S.W.2d
515 (Tex. App.-Fort Worth 1997, no pet.). No one testified as to the circumstances
involved in programming and establishing of the re-enactment; and Mr. Young only testified
that "it's pretty near what I saw that day. It sure is." (19.216.6). Thus, such tape is not
authenticated under the R. 901(b)(1) T.R.E. Webb v. State, 760 S.W.2d 263 (Tex.
Crim. App. 1988).


 At trial, the State questioned Young about a videotaped re-enactment of the encounter:

Q. Have you had an occasion, Mr. Young, to see a video tape that was made showing
the drive that you took with a pickup setting there in the road like it was that day?


A. Yes.


Q. Does that video tape show fairly and accurately about what you saw that day?


A. That's right.


Q. Is there anything about that tape that's different that you can tell by looking at it?


A. No. The only thing about it seemed like it was a little clearer that day, the sun shining,
than the tape shows. But other than that it wasn't nothing different. Nothing different
about the tape.


After the State tendered the videotape, appellant objected that "the circumstances then as opposed to now
are not sufficiently similar to allow the entry of this tape." Appellant then took the witness on voir dire. 
After questioning the witness about the specifics of what he saw that day and his ability to observe the
events, appellant asked, "But what's on the video tape is not exactly what you saw that day, is it?" Young
replied, "It's pretty near what I saw that day. It sure is." Appellant then objected: "[I]t's not significantly
similar to the event or what he saw on that day. I believe it would be confusing to the jury because what
he's going to testify to is not what's on this tape."

 Appellant's objection at trial was that the videotaped re-enactment was not significantly similar to
the events observed by the witness. (8) Appellant does not explain how the videotape differs from Young's
description of events. Young testified that the videotape was virtually identical to what he saw, except that
lighting was better during the actual events than on the videotape's rendition. The trial court was within its
discretion to conclude that the videotape depiction was in fact significantly similar to the events the witness
observed. (9)

 As for appellant's complaint that no one testified about the circumstances involved in making the
tape (who, what, when, where, etc.), this complaint was not lodged at trial and is therefore forfeited on
appeal. (10) Point of error two is overruled.

2. Optional completeness


 In point of error three, appellant contends that the trial court erred in refusing to admit notes from
the medical examiner's files. He contends that he was entitled to admit the notes under the rule of optional
completeness. Appellant's argument, in its entirety, is as follows:

When one party introduces part of some writing, the opposing party may introduce the
rest. Rule 107, T.R.E. The Court admitted into evidence an autopsy report by the State. 
(20.224.15). Therefore, the defense should be permitted to offer other writings in Dr.
Gonsoulin's file explaining the contents of the autopsy report, if those writings are
necessary to avoid giving the jury a false impression of the report. Credille v. State, 925
S.W.2d 112, 116-117 (Tex. App.-Houston [14th Dist. 1996, pet. ref'd). Statements in
DX-13 p. 2 and 3 could easily be read to contradict Dr. Gonsoulin's statement in her
autopsy report that the injuries were not consistent "with ejection from impact with a
vehicle." SX-54 p. 7.


 Appellant fails to give record references to the trial court's ruling refusing to admit the notes or to
appellant's objection to that ruling. Also, appellant does not say how these notes explain the autopsy report
or why they are necessary for a full understanding of the report or to avoid a false impression. While
appellant contends that some of the statements contained in the notes contradict the conclusion of the
autopsy report, he does not specify which statements nor does he say why they contradict the report. But
despite the fact that this point of error is inadequately briefed in several respects, (11) we will address the
merits. 

 The rule of optional completeness provides:

When part of an act, declaration, conversation, writing or recorded statement is given in
evidence by one party, the whole on the same subject may be inquired into by the other,
and any other act, declaration, writing or recorded statement which is necessary to make
it fully understood or to explain the same may also be given in evidence, as when a letter
is read, all letters on the same subject between the same parties may be given. "Writing
or recorded statement" includes depositions. (12)


 The notes contain two statements (on the second and third pages respectively) that could be viewed
as beneficial to appellant: (1) law enforcement officials knew the victim from previous arrests, including an
incident at a drug lab the week before, and (2) appellant stated that the victim had jumped out of the truck
on her own accord. Both of these statements would be inadmissible in their own right: the first being both
hearsay and character evidence and the second being at least double hearsay. (13) Neither of these
statements has any bearing on the reliability of the autopsy report's conclusions, which were derived from
a medical analysis of the victim's injuries. The victim's association with illegal drugs and the defendant's
statement that she jumped do not change the nature of the injuries the victim sustained. Moreover,
appellant's contention on appeal that the statements "could easily be read to contradict Dr. Gonsoulin's
statement in her autopsy report that the injuries were not consistent 'with ejection from impact with a
vehicle'" is somewhat misleading. The medical examiner found that some injuries were consistent with
ejection and others were not. In any event, the statements in the notes were not necessary to explain the
report and excluding the notes did not create a false impression. While appellant's self-serving statement
was at odds with the conclusions in the autopsy report, evidence does not become admissible under the
rule of optional completeness simply because it may lead to a different conclusion than other, admitted
evidence. (14) Point of error three is overruled. 

3. Lesser offenses


 In point of error four, appellant contends that the trial court erred in refusing to submit requested
lesser-included offense charges on manslaughter and criminally negligent homicide. In the argument on this
point, he also contends that the court erred in excluding evidence that, two weeks earlier, the victim had
attempted to jump out of his truck while it was moving. Appellant claims that this excluded evidence would
have lent further support to his request for lesser-included offense instructions by showing appellant's state
of mind at the time of the alleged offense.

 We will assume, without deciding, that there was error in denying the requested instructions and
in excluding the evidence. We turn to the question of harm. For error involving the jury instructions, we
look to the "some harm" standard set forth in Almanza v. State. (15) Under Almanza, we determine whether
there was actual rather than theoretical harm. (16) While appellant does not claim the exclusion of evidence
as error independent from the denial of the requested jury instructions, to the extent that his claim can be
construed as independent, we will review the claim under the "substantial rights" standard for non-constitutional errors, set forth in Texas Rule of Appellate Procedure 44.2(b). (17) For the admission of
evidence, that standard requires that an appellate court determine whether the error had "a substantial and
injurious effect or influence in determining the jury's verdict." (18) For both harm standards, the appellate
court conducts its own review, without placing a burden of proof on either of the parties. (19) 

 The trial court did submit lesser-included offense instructions on murder (20) and kidnapping. 
Although a jury's rejection of intervening lesser-included offenses may not always render error harmless,
those circumstances can militate strongly in favor of a finding of harmlessness. (21) When some lesser-included offenses are submitted, the harm ordinarily present in failing to submit requested lesser offense
instructions - that the jury would convict of the greater offense despite its reasonable doubts because it
lacked a palatable alternative to acquittal - would be mitigated by an available compromise. (22) 

 This case is complicated by the claim that there was some evidence germane to the lesser offense
that the jury was not permitted to hear. However, even assuming the full probative force of all evidence,
whether admitted or not, tending to show that the victim jumped from a moving motor vehicle, such
evidence was far outweighed by evidence pointing to an intentional murder. Extremely damaging evidence
came from the medical examiner's testimony and her autopsy. As we have summarized above, the medical
evidence showed that the victim was strangled to the point of death or near-death before she received any
blunt-force injuries. After strangulation, she was in no condition to move, much less jump out of a vehicle. 
Even if we assumed that defense counsel's cross-examination of the medical examiner raised the possibility
that someone could suffer the victim's neck injuries, survive, and later recover, there was not enough time
for such a recovery process to take place. 

 The damaging medical evidence was further bolstered by Young's testimony that appellant pulled
the victim's body out of the vehicle and laid it onto the ground. Also supporting a theory of intentional
murder was the testimony of four different people that within a day of the victim's death appellant expressed
the intent to kill her.

 Moreover, appellant's proffered evidence was a double-edged sword because it showed his
violent character. The evidence was the victim's statement to a deputy sheriff that she had tried to exit a
motor vehicle while she and appellant were traveling down the road. This evidence arose from an incident
that began at the Bustin' Loose and escalated at appellant's mother's home. (23) While traveling to
appellant's mother's house, appellant and Markie were arguing, and appellant attempted to beat Markie's
head against the dash of his truck. Markie tried to jump out of the vehicle but was pulled back in by
appellant. Her face had come within inches of the pavement. When they arrived at appellant's mother's
home, the argument continued. As appellant and Markie argued, appellant's mother stepped between
them. Appellant then threw his mother on the couch. When Markie threatened to call the police, appellant
ran out of the home through a sliding glass door, breaking the glass. Terrified, Markie ran to a neighbor's
house. She told her neighbor that appellant was crazy and that he was going to kill her. If Markie's
statement about attempting to jump out of the truck were admitted (as an excited utterance), (24) this other
evidence would have been admissible along with it. (25) We conclude that any error regarding the failure to
submit the requested instruction, or the failure to admit the complained-of evidence, is harmless. Point of
error four is overruled.

4. Investigator's testimony


 In point of error five, appellant contends that the trial court erred in excluding testimony from a
defense investigator. The investigator would have testified that he determined, through personal
experimentation on a truck similar to the one driven by appellant, that he could not reach the passenger
door and open it while driving. The State argues that the testimony was not relevant because appellant
failed to offer evidence comparing the height, weight, arm length, strength, age, and physical condition of
the investigator and appellant. While we do not necessarily agree with every item in the State's checklist,
we do agree that some evidence of similar physical characteristics would be required for the evidence to
be relevant. While the trial court had the opportunity to observe both individuals, we have no such
opportunity on appeal. Having failed to include in the record evidence of relevant physical similarities
between the two individuals, appellant has failed to demonstrate that the trial court abused its discretion.

 Moreover, even if there were error, it would be harmless. The State's theory of the case, as
expressed in the opening statement and closing argument, was that the defendant strangled the victim, pulled
her out of his truck, and then ran over her body with the truck. The extensiveness of the victim's blunt force
injuries suggests she that did not incur them simply by falling or being pushed out of a moving truck. 
Young's testimony also bolstered the theory that the victim was never pushed out of the truck but was
strangled and then later pulled out of the truck from the passenger side onto the ground. Confirmation from
a defense investigator that the victim could not have been pushed out of the truck would have done nothing
to answer the State's case, and in fact, could have been viewed as supporting Young's testimony and the
State's theory that the victim was pulled out of the truck after being strangled. Point of error five is
overruled.

5. Prosecutorial misconduct


 In point of error six, appellant contends that the prosecuting attorney committed misconduct during
the trial. His argument under that point, in its entirety, is as follows:

Many times the prosecuting attorney would make comments regarding testimony without
making an objection until he was asked by the Court to state a legal objection. Below are
listed 46 times (26) during the trial that illustrates [sic]attempts to discredit either the witness
or the defense counsel. One illustrated example may not constitute harm. It is the
voluminous list that creates the harm. The following list contains references to volume,
page and line of examples of such prosecutorial misconduct; establishing on the record
how Acker did not receive a fair and impartial trial. Art. 36.19 C.C.P.


This argument is followed by a list of forty-eight record citations. Appellant does not say he objected to
these alleged instances of prosecutorial misconduct. He also does not state exactly what is improper about
each of these instances, and he does not explain how he was harmed.

 We have reviewed the first twelve record citations. In none of those twelve instances did appellant
object to the prosecutor's comments. Contrary to appellant's assertion, the first instance was phrased by
the prosecutor as an objection. The second and third instances were attempts by the prosecutor to permit
a witness to answer a question asked by defense counsel after counsel had interrupted the witness. The
fourth and fifth instances involved the prosecutor asking that appellant's sister be treated as a hostile witness
during the State's direct examination. The sixth instance was a response to defense counsel's objection,
and therefore, one would not expect the prosecutor to phrase a legal objection. (27) Four of the remaining
six instances were objections that were not preceded by the word "objection," and some of these were
worded argumentatively and possibly were objectionable. One of the instances was a request to instruct
defense counsel to stop asking irrelevant questions, and one was simply a remark.

 If some of the later citations do involve preserved error, it was appellant's responsibility to point
out which ones. Moreover, if appellant is attempting to claim fundamental error that needs no objection,
he has failed to allege that fundamental error is involved, has failed to argue why it is fundamental, and has
failed to cite any legal authority for why fundamental error would be involved, except to refer to Article
36.19, which applies to jury charges. And in fact, of the twelve instances we have reviewed, only some
of them appear to be potentially objectionable. Appellant has failed to adequately brief this point of error. (28) 
Point of error six is overruled. 

6. Constitutionality of the death penalty


 In point of error one, appellant contends that the statutory death penalty scheme is unconstitutional
for a variety of reasons: (1) it limits jury consideration of the special issues, thus not permitting the jury to
consider and give effect to all mitigating circumstances that exist concerning the defendant, (2) it chills the
defendant's ability to present relevant mitigating evidence to the jury, thereby denying the defendant the
effective assistance of counsel, (3) it gives prosecutors unfettered discretion in deciding whether to seek
the death penalty in any particular case, (4) it does not provide for the possibility of a life sentence without
parole, virtually insuring that the jury will impose a death sentence, (5) it permits the admission of
unadjudicated extraneous offenses at punishment, violating the heightened reliability requirement of the
Eighth and Fourteenth Amendments and the Equal Protection Clause of the Fourteenth Amendment.

 Appellant does not explain how the current scheme limits the jury's consideration of the special
issues or why any such limitation violates the constitution. He does not explain how the current scheme
prevents the jury from considering and giving effect to all mitigating circumstances. Nor does he explain
how the current scheme affects the defendant's ability to present relevant mitigating evidence. He does not
explain how a prosecutor's unfettered discretion to seek the death penalty violates the constitution, nor
does he explain why the absence of a life-without-parole option guarantees a death sentence. Nor does
he explain how the admission of unadjudicated offenses at punishment violates the "heightened reliability" (29)
requirement or the Equal Protection Clause of the United States Constitution. His claims under this point
are essentially pro forma, and as such, are inadequately briefed. (30)

 The trial court's judgment is affirmed.

 KELLER, Presiding Judge

Date delivered: November 26, 2003

Do not publish 
1. Tex. Penal Code §19.03(a). 
2. Article 37.071 §2(g). Unless otherwise indicated all references to Articles refer to the Code
of Criminal Procedure.
3. Article 37.071 §2(h). 
4. During direct examination by the State, Vititow was reluctant to testify about the details of the
incident, but the State treated her as a hostile witness and elicited those details with leading questions
and the help of earlier statements. 
5. When asked by the State why she refused to give back the knife, Vititow claimed that she
refused to do so because the knife actually belonged to Markie.
6. Smiddy's wife, Alicia Smiddy, subsequently gave similar testimony.
7. Although Gonsoulin was in charge of conducting the autopsy, several other doctors also
signed the report.
8. We question whether the objection made is properly characterized as one of authentication,
under Rule 901, as opposed to one of relevance or prejudice, under Rule 401 or 403. Given our
disposition of this point, we need not address that issue here.
9. Willover v. State, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002)(appellate court must
uphold trial court's decision if reasonably supported by the record); see also Guzman v. State, 955
S.W.2d 85, 89 (Tex. Crim. App. 1997)("trial courts have broad discretion in their evidentiary rulings
and . . . are usually in the best position to make the call on whether certain evidence should be admitted
or excluded"). 
10. Tex. R. Evid. 103(a)(1).
11. Tex. R. App. P. 38.1(h)("The brief must contain a clear and concise argument for the
contentions made, with appropriate citations to authorities and to the record"). 
12. Tex. R. Evid. 107.
13. See Tex. R. Evid. 404 and 801, et seq.
14. See Allridge v. State, 762 S.W.2d 146, 153 (Tex. Crim. App. 1988)(introduction of
adverse evidence did not make self-serving hearsay statements of the defendant admissible under the
rule of optional completeness).
15. 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).
16. Dickey v. State, 22 S.W.2d 490, 492 (Tex. Crim. App. 1999).
17. Rule 44.2(b) provides: "Any other error, defect, irregularity, or variance that does not affect
substantial rights must be disregarded." 
18. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)(citing Kotteakos v. United
States, 328 U.S. 750 (1946)). 
19. Ovalle v. State, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000); Johnson v. State, 43
S.W.3d 1, 5 (Tex. Crim. App. 2001).
20. The theory of murder submitted was an intentional or knowing killing.
21. Saunders v. State, 913 S.W.2d 564, 572-573 (Tex. Crim. App. 1995).
22. Id. at 572.
23. We tell the incident as it was related by Markie to two witnesses: the deputy sheriff and a
neighbor. Although appellant offered the testimony of both witnesses at trial and the trial court
excluded the testimony of both witnesses, appellant complains on appeal only about the exclusion of the
deputy sheriff's testimony.
24. In response to the State's hearsay objection, the defendant offered the evidence as an
excited utterance. See Tex. R. Evid. 803(2).
25. Tex. R. Evid. 107.
26. There are actually forty-eight citations.
27. The fifth instance was also a response to defense counsel's objection.
28. See Tex. R. App. P. 38.1(h).
29. Presumably, this is a reference to the Eighth Amendment's prohibition against cruel and
unusual punishments.
30. See Tex. R. App. P. 38.1(h).