IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-74,344






RICHARD ALLEN MASTERSON, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM HARRIS COUNTY






Keller, P.J., delivered the opinion of the unanimous Court.


O P I N I O N



 Appellant was convicted of a capital murder (1) committed on January 27, 2001. Pursuant to
the jury's answers to the special issues set forth in Texas Code of Criminal Procedure, Article
37.071, §§2(b) and 2(e), the trial judge sentenced appellant to death. (2) Direct appeal to this Court is
automatic. (3) Appellant raises eight points of error. We will affirm.

I. GUILT


A. Appellant's recorded confession


 In points of error two and three, appellant complains about the admission into evidence of
a tape-recorded confession taken from him by a Texas police officer while appellant was in custody
in Florida. In point of error two, he complains that his confession was induced by a promise of
leniency for his nephew. In point of error three, he complains that his confession was taken after he
invoked his right to counsel. (4)

1. Background


 After the victim was murdered, appellant drove the victim's car to Georgia. He left that car
with relatives and continued on to Florida, where he was arrested after stealing another car. In the
meantime, appellant's nephew was arrested for possession of cocaine left by appellant in the victim's
car. 

 Houston police officer David Null interviewed appellant at the Marion County, Florida jail. 
Null testified that he advised appellant of all the warnings required by Article 38.22. After each
warning, he asked appellant whether he understood the warning, and appellant answered
affirmatively each time. Null then asked whether appellant wished to give up those rights, and
appellant stated that "he wanted to clear things up." Null testified that he never made any promises
to appellant, never offered appellant anything in exchange for talking about the murder case, and
never threatened appellant or any member of appellant's family. Regarding appellant's nephew, Null
testified that he was aware that the nephew had been caught in a stolen car, but did not offer anything 
to the nephew in exchange for a statement in the case. Null said that appellant did say that there had
been dope in the car and that the dope belonged to appellant and not to the nephew. When asked
whether he offered to help the nephew in any way, Null testified: "I told him [appellant] that if the
dope was his and he wanted to admit the dope was his that I would let the people know that he was
admitting that the dope, it was his dope." Null also testified that appellant never asked for an
attorney.

 Appellant testified that, when Null said he wanted to ask some questions, "I asked him if I
needed a lawyer." According to appellant, Null ignored his question. Appellant also testified that
he had earlier asked a magistrate at extradition proceedings "if I could get a lawyer." With regard
to his nephew, appellant testified that he told Null about his nephew's situation and asked "if they
could get that took care of." According to appellant, Null replied that "he'd see what he could do." 
Appellant testified that he understood that answer to mean "[t]hat he, if I cooperated with him, he
would help me out."

 At the end of the suppression hearing, the trial court found: 

There is no credible evidence to indicate that the defendant was ever promised
anything to make this statement. The credible evidence shows that the defendant
never asked for a lawyer, that he waived his rights and freely and voluntarily gave the
statement to Officer Null.



2. Analysis


 In reviewing a trial court's ruling on a motion to suppress, the appellate court should afford
almost total deference to the trial court's determination of the historical facts, especially when that
determination involves an evaluation of the credibility and demeanor of witnesses. (5) With respect
to both of appellant's claims, the trial court was free to believe Officer Null's testimony and
disbelieve appellant's testimony. 

 With regard to whether an impermissible promise was made, Officer Null stated that he
simply told appellant, if the drugs belonged to him and he wanted to admit to that, Null would pass
along that admission. In Martinez v. State, (6) we addressed a similar situation. In that case, the police
detective testified that he told the defendant that he needed to know who the drugs belonged to, and
from that the defendant "could have gathered" that his father and brother would not be charged if
the defendant "accepted responsibility." (7) We held that "the evidence supports the implied finding
that no positive promise was ever made by the detective" to the defendant. (8) In the present case, the
police officer's statements were even more circumspect because he simply indicated that he was
willing to pass along any information the defendant wanted to convey. No positive promise was
made. Moreover, the evidence suggests that appellant initiated the discussion regarding helping his
nephew. "Having cast himself in the role of entrepreneur, [appellant] cannot expect an appellate
court to find implied 'promises' in official responses (to his overtures) that are ambiguous at best." (9)

 Regarding appellant's claim that he requested counsel, the trial court was within its discretion
to believe Null's testimony that no counsel was requested. Appellant contends, however, that the
trial court had no discretion to disbelieve appellant's testimony about requesting counsel before the
magistrate because the State never controverted that testimony. But the trial court has discretion to
disbelieve testimony even if it is not controverted. (10) The trial court did in fact discount appellant's
testimony and was within its discretion to do so. Points of error two and three are overruled. 

B. Lesser-included offense
 

 In point of error one, appellant contends that the trial court erred in refusing to submit his
requested instruction regarding the lesser-included offense of criminally negligent homicide. At
trial, appellant testified that he met the victim at a "hustler bar," went home with him, and engaged
in consensual sexual conduct with him. According to appellant, the victim requested that appellant
perform a "sleeper hold" to enhance the quality of the victim's sexual experience. Although the
"sleeper hold" resulted in the victim's death, appellant testified that this result was unintended. 

 Assuming, without deciding, that appellant was entitled to the requested instruction, we find
any error to be harmless. The jury was instructed on the lesser-included offense of manslaughter. (11) 
We held in Saunders v. State that the jury's failure to find an intervening lesser-included offense
(one that is between the requested lesser offense and the offense charged) may, in appropriate
circumstances, render a failure to submit the requested lesser offense harmless. (12) This is so because
the harm from denying a lesser offense instruction stems from the potential to place the jury in the
dilemma of convicting for a greater offense in which the jury has reasonable doubt or releasing
entirely from criminal liability a person the jury is convinced is a wrongdoer. (13) The intervening
lesser offense is an available compromise, giving the jury the ability to hold the wrongdoer
accountable without having to find him guilty of the charged (greater) offense. (14) While the existence
of an instruction regarding an intervening lesser offense (such as manslaughter interposed between
murder and criminally negligent homicide) does not automatically foreclose harm - because in some
circmstances that intervening lesser offense may be the least plausible theory under the evidence (15)
- a court can conclude that the intervening offense instruction renders the error harmless if the jury's
rejection of that offense indicates that the jury legitimately believed that the defendant was guilty of
the greater, charged offense. (16) 

 In Saunders, the defendant was charged with murder by squeezing a baby's head with intent
to cause serious bodily injury. (17) The trial court denied the defendant's request to include in the jury
charge an instruction on criminally negligent homicide but did include an instruction on "involuntary
manslaughter" (18) (now known simply as "manslaughter"). (19) The basic difference between
(involuntary) manslaughter and criminally negligent homicide was (and is) that "in the former, that
actor recognizes the risk of death and consciously disregards it, while in the latter he is not, but ought
to be, aware of the risk that death will result from his conduct." (20) We found significant evidence in
the record that the defendant was aware of the risk of death, (21) and therefore, manslaughter was a
realistic option for the jury. (22) Consequently, the jury's conviction of the defendant for murder,
despite the availability of involuntary manslaughter, indicated that the jury did in fact believe that
the defendant harbored the specific intent required for the charged offense. (23)

 Like the defendant in Saunders, appellant was denied an instruction on criminally negligent
homicide but received an instruction on manslaughter. In addition, the record in the present case also
contains significant evidence of appellant's awareness of the risk of death. On the witness stand,
appellant testified that he initially refused the victim's request to apply a "sleeper hold" because
doing so "scares" him. He testified that he had performed such a hold before, and he testified that
he knew just by looking at the victim after he performed the "sleeper hold" that the victim was dead. 
Under the circumstances, if the jury truly believed that appellant performed a "sleeper hold" as a
sexual maneuver and did not intend to kill the victim, the jury could easily have given effect to that
belief by acquitting appellant of capital murder and convicting him of manslaughter. That the jury
chose not to do so shows that it did not believe appellant's story. We conclude that any error was
harmless. Point of error one is overruled.

II. PUNISHMENT


A. Sufficiency of the evidence - future dangerousness


 In point of error five, appellant contends that the evidence is legally insufficient to support
the jury's answer to the "future dangerousness" special issue (24) because, due to his testimony that he
would attempt to commit criminal acts of violence in the future, prison authorities would not allow
him to do so in prison and parole authorities would refuse to ever authorize his release.

 During direct examination at the punishment phase of trial, appellant testified:

[L]ike [the prosecutor] told 'em from the beginning when they were picking the jury,
they have to answer two questions, am I going to be a future danger? Am I going to
protect myself by any means necessary? Yes I am. That makes me a future danger,
yes, I am. Second issue, is there any mitigating circumstance. I don't think so. 
Everybody lives and dies by the choices that they make. None of my family out there
could control what I did. I did what I did because I wanted to do it, not because they 
made me do it, or because I got my ass whooped. I got my ass whooped because I
deserved it a lot of times. Sometimes I got my ass whooped because I didn't deserve
it but most of the time I - I did something wrong, I got punished for it. So whatever
your decision is, I accept that. You found me guilty, you must believe I'm guilty. 
And if you send me to prison, for life, the chances are, in the Texas Department of
Corrections the chances are I'm going to have to defend myself, and like I said, I will
defend myself, whether it's against a guard or inmate or anybody else by any means
necessary. If that means a guard puts his hands on me I'm going to put my hands on
him. If a[n] inmate comes up to me with a knife and tries to stab me, I'm going to
stab him or do whatever it takes to save my life from him. 


Later, on cross-examination, the following transpired:


Q. You mentioned that you wanted - you think the jury should answer the special
issues in such a way that you get the death penalty, right?


A. If they're following the law, yes.


Q. They have to, right?


A. Yes, if they're following the law, yes.


Q. Because it's clear you're a future danger, right?


A. If it's - if me protecting myself or my property, yes, I'm a future danger.


Q. And you would do whatever it takes, be it hurt another inmate, hurt another
guard, to prove that, right?


A. Not necessarily, but if that arises, yes I will, and I'm sure within 40 years, it will
arise sometimes.


Q. You're positive there's no way you could stay in prison probably even for a year
without getting violent again, right?


A. Probably not. Probably not even a month.


In his brief, appellant argues that the evidence clearly showed that he is a danger to both prison and
free society:

From the evidence of the primary offense against Shane Honeycutt, the offense
against Steven and evidence at punishment about Appellant's commission of threats
and violence against others in the free world, the jury must have drawn the
conclusion that Appellant presented a real danger, a threat to people in free society. 
The testimony of jail personnel about Appellant's violent conduct toward others in
the county jail, including fighting with other inmates and including verbal threats to
one deputy, about his membership in the Aryan Brotherhood gang (a gang which was
also present in the Texas prison system, according to a deputy witness) and his
readiness to defend the Brotherhood against "disrespect" with violence. Together
with Appellant's own testimony that he would continue to commit criminal acts of
violence in prison whenever he deemed it necessary (which he told the prosecutor he
believed would probably occur "within a month") was certainly evidence relevant to
the jury's decision about the likelihood of Appellant's being a continuing threat to
prison society. Appellant's feelings of remorse, or even regret, for any of his
violence toward others were remarkable for their absence; for example, Officer Null,
who took Appellant's tape recorded statement, testified at guilt that Appellant told
him that Honeycutt's death "didn't really matter to him, he didn't feel any remorse
about it, he wasn't upset about it because he didn't know him - and it just didn't
matter." At punishment, Deputy Urick said when he told Appellant in the jail that
he would write him up for refusal to follow Urick's order to pick up his food tray,
Appellant told him he would "choke you like I choke my victims." In short, the
evidence was strongly suggestive that Appellant would be, and would strive to be a
continuing threat both in prison and in free society, were he ever to get there.


Appellant argues that, given the obvious threat he poses, prison officials would place him in
lockdown to protect guards and other inmates from him. In addition, appellant argues that the parole
authorities would never parole such a dangerous person. He concludes that he does not in fact
constitute a future danger because the authorities will act to neutralize his ability to threaten others. 

 Appellant's argument appears to be that he is so dangerous that he is not dangerous. His
contention is ingenious but unpersuasive. If accepted, it would stand the capital punishment scheme
on its head, giving relief to the most dangerous offenders. We will not speculate, for legal
sufficiency purposes, about the effectiveness of the prison and parole authorities' methods of
protecting society from those who are intent on committing future criminal acts of violence. Point
of error five is overruled.

B. Order of closing argument


 In point of error four, appellant contends that the trial court erred in refusing his request to
give the concluding argument in punishment on the mitigation special issue. Appellant contends that
Article 36.07 does not govern capital cases, that the trial court has discretion to change the order of
arguments in a capital case, that the State has no burden of proof on the mitigation issue and any
burden that does exist is on the defendant, and that his constitutional rights were violated by the
"psychological advantage" the State had "in making the last impression on the jury" in a death
penalty case.

 Article 36.07 provides: "The order of argument may be regulated by the presiding judge; but
the State's counsel shall have the right to make the concluding address to the jury." Appellant
contends that Article 36.07 does not apply to capital cases. His only reason for so concluding is the
assertion that the procedure in capital cases is controlled by Article 37.071, and that article is silent
as to the order of argument. However, the fact that Article 37.071 controls many aspects of capital
punishment proceedings is not, by itself, sufficient to reject the applicability of a statute that, on its
face, appears to apply to all criminal trials. And in fact, we have previously held that Article 36.07
applies to capital cases, including the punishment phase of a capital murder trial. (25) The State
suggests that Article 36.07 may be preempted by the following sentence in Article 37.071: "The state
and the defendant or defendant's counsel shall be permitted to present argument for or against a
sentence of death." (26) But that provision covers only the content of argument: the parties are
permitted to explicitly argue for or against a "death sentence" rather than simply arguing the special
issues. That situation is unique to death penalty cases, and thus, is understandably included in
Article 37.071. Nothing in the Code of Criminal Procedure limits the application of Article 36.07
to non-capital cases and we see no reason to do so.

 Appellant argues that, in civil cases, the final argument falls to the shoulders of whoever has
the burden of proof. But we have held that Article 36.07, not the civil rules, applies to criminal
cases. (27) In Martinez v. State, we rejected the defendant's claim that the issue of insanity gave him
the right to open and close argument, even though insanity was the only contested issue in the case
and one on which the defendant carried the burden of proof. (28) We held that the trial court's refusal
to permit the defendant to open and close under those circumstances did not deprive the defendant
of any consititutional right. (29) In a capital case, we have likewise rejected a defendant's claim that
a trial court's failure to allow defense counsel to rebut the prosecutor's arguments rendered his trial
fundamentally unfair. (30) We see nothing about the mitigation special issue, which imposes a burden
of proof on neither party, (31) that distinguishes appellant's situation from our prior holdings. Point of
error four is overruled.

C. Constitutionality of the death penalty


1. Future dangerousness issue


 In point of error six, appellant contends that the future dangerousness issue is
unconstitutional because the issue is not susceptible to proof beyond a reasonable doubt and cannot
be applied fairly by the jury. He contends that a jury will tolerate no risk in determining whether the
defendant constitutes a future danger to society. We have previously rejected this claim. (32)

2. Failure to inform jurors of effect of hung jury


 In points of error seven and eight, appellant contends that his Eighth Amendment right
against cruel and unusual punishments was violated by the trial court's refusal to inform the jurors
that a failure to arrive at a unanimous verdict in favor of the State on the punishment issues would
result in a life sentence. He acknowledges that the failure to so inform the jury is sanctioned by
statute and challenges the constitutionality of the part of Article 37.071 that is often called the "12-10" rule. We have previously rejected such arguments. (33) Appellant relies upon the dissent in Jones
v. United States, (34) but the dissent is just that - a dissent. Relying upon the majority opinion in Jones,
we have recognized that the Supreme Court has found that the Eighth Amendment does not require
that jurors be informed of the effect of a failure to reach unanimous agreement on the punishment
issues. (35) Points of error seven and eight are overruled.

 The judgment of the trial court is affirmed.

 KELLER, Presiding Judge

Date delivered: February 2, 2005

Publish 
1. TEX. PEN. CODE §19.03(a).
2. Art. 37.071, §2(g). Unless otherwise indicated, all references to Articles are to the
Texas Code of Criminal Procedure.
3. Art. 37.071, §2(h).
4. Appellant argued these two points of error together in his brief, and we address them
jointly here.
5. Maldonado v. State, 998 S.W.2d 239, 247 (Tex. Crim. App. 1999)(citing Guzman v.
State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) and applying its standard to a "promise"
claim); Ripkowski v. State, 61 S.W.3d 378, 381-382 (Tex. Crim. App. 2001), cert. denied, 539
U.S. 916 (2003)(applying Guzman standard to Miranda claims).
6. 127 S.W.3d 792 (Tex. Crim. App. 2004).
7. Id. at 793.
8. Id. at 795.
9. Johnson v. State, 68 S.W.3d 644, 654-655 (Tex. Crim. App. 2002)(quoting Henderson
v. State, 962 S.W.2d 544, 564 (Tex. Crim. App. 1997), cert. denied, 525 U.S. 978
(1998))(bracketed material inserted, other brackets deleted).
10. State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).
11. The jury was also instructed on the lesser-included offenses of murder, robbery, and
aggravated assault.
12. 913 S.W.2d 564, 572 (Tex. Crim. App. 1995).
13. Id.
14. Id.
15. Id. at 573.
16. Id. at 574.
17. Id. at 566.
18. Id. at 565-566.
19. See Acts 1993, 73rd Leg., ch. 900, §1.01.
20. Saunders, 913 S.W.2d at 565.
21. Id. at 573-574.
22. Id. at 573.
23. Id. at 574.
24. The issue asks: "whether there is a probability that the defendant would commit
criminal acts of violence that would constitute a continuing threat to society." Art. 37.071,
§2(b)(1).
25. Norris v. State, 902 S.W.2d 428, 442 (Tex. Crim. App.), cert. denied, 516 U.S. 890
(1995); see also Cherry v. State, 488 S.W.2d 744, 757 (Tex. Crim. App. 1972)(opinion on
original submission), cert. denied, 411 U.S. 909 (1973).
26. Art. 37.071, §2(a)(1).
27. Martinez v. State, 501 S.W.2d 130, 131-132 (Tex. Crim. App. 1973), appeal dism'd,
415 U.S. 970 (1974); Brown v. State, 475 S.W.2d 938, 957 (Tex. Crim. App. 1971).
28.  501 S.W.2d at 132.
29. Id.
30. Norris, 902 S.W.2d at 442.
31. Escamilla v. State, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004).
32. Resendiz v. State, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003), cert. denied, 124 S.
Ct. 2098 (2004).
33. Escamilla, 143 S.W.3d at 828; Busby v. State, 990 S.W.2d 263, 272 (Tex. Crim. App.
1999), cert. denied, 528 U.S. 1081 (2000). 
34. 527 U.S. 373 (1999).
35. Resendiz, 112 S.W.3d at 549.