

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-17-00815-CR

Issac **WILLIAMS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2014CR8370B
Honorable Joey Contreras, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Patricia O. Alvarez, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: April 10, 2019

REVERSED AND REMANDED

After a jury trial, Issac Williams was found guilty of continuous trafficking of persons and was sentenced to fifty years of imprisonment. On appeal, he brings twenty-three issues. Because we hold the trial court erred in denying his request for a lesser-included instruction on human trafficking of persons, we reverse the judgment of the trial court and remand the cause for a new trial.

## BACKGROUND

Williams was accused of trafficking B.F., a minor, during a period that was more than thirty days in duration. During the guilt/innocence portion of trial, the following witnesses testified: the complainant B.F.; Sergeant John Elizarde; Agent Shawn Hallett; Christopher Hill; Agent Johnny Hirst; Sergeant Stormye Jackson; Laurie Smith, and Williams.

At trial, B.F. testified about her home life, meeting Williams, and how she engaged in prostitution with Williams and a woman named Deborah Ameia Cooper. As a teenager, B.F. did not have a stable home life. She and her mother "argued a lot, and so those arguments sometimes turn[ed] into scruffles [sic], and sometimes, [her mother] would kick [B.F.] out." When B.F. was thirteen years old, she lived in Maryland[1] with her mother and younger brother. According to B.F., while the family was living in Maryland, they were "homeless for a good while," "on the street homeless." B.F. explained,

> I had to basically have sex for money, so we could get food because we didn't have any money at all. So, it – it wasn't something that I wanted to do, but I needed to feed [my younger brother] because he's, you know, he's sick, and he had the CMV virus. He's deaf; he's autistic; and it takes a lot to take care of a person like that, and I always felt like I had to help. So, I did that for my mom, even though she didn't have any money.

When asked on cross-examination who suggested to her at thirteen years old that she should prostitute herself for her family, B.F. was adamant that "[n]o one suggested it." She testified she thought of it all herself.

According to B.F., when she was fifteen years old, she met Williams on social media– specifically on a website called Tagged. Williams was in his late twenties. B.F. testified she and Williams messaged each other for about six to seven months before they met in person in

---

[1] B.F. and the family later moved to Killeen, Texas.

December 2013[2] at Lions Park in Killeen, Texas. The park was within walking distance from where she lived with her mother. B.F. testified she and her mother had gotten into an argument, and her mother had "kicked her out" of the apartment. According to B.F., she and Williams talked for about an hour in his Cadillac. Williams then began to ask B.F. about her past sexual experiences, and B.F. told him about prostituting herself in Maryland:

> [H]e just kept saying he would buy me stuff, that he can get me—he can get me money, you know, so I could have my own money, so I could have my own money, so I can do what—basically, what I wanted to do. And, you know, "Your mom's not taking care of you. Now, why would she, you know, kick you out? I can give you basically something better than she had. . . . He kind of, like I say, sugarcoated to have sex for money, but it wasn't just blatant, "Okay. Do you want to have sex for money?" It was more persuasive, kind of, sort of, I guess I can say.

B.F. testified she and Williams then had sex in the car, and Williams later took her back to a hotel. B.F. testified, "[T]hat's when the actual and real conversation came up of what I was actually going to be doing." On his mobile phone, Williams pulled up the website Backpage and navigated to the "adults" and then to the "escorts" section. B.F. testified Williams explained the entire process of placing Backpage ads to find customers and how B.F. could get started. When asked how this made her feel, B.F. replied,

> It made me feel happy, but I was confused because, like, okay, I did this before; but at that time, I didn't know what an escort was. I thought it was, you know, the people who like, you know, walk people like that out of a club or, you know, like a police officer, they escort you around, not a prostitute. I don't know.

According to B.F., Williams said she would keep some of the money she made. However, "over time, [B.F.] realized that [she] got none of it, that he kept all of it."

B.F. testified Williams then introduced her to a twenty-year-old woman, whom Williams called "Kandy." During the trial, this woman is referred to by many names, including "Ameia,"

---

[2] B.F.'s testimony is not consistent on the issue of her age at the time she first met Williams in person. She is clear, however, that she first met Williams in person in December 2013. As her birthday is March 19, 1997, she was sixteen years old when she first met Williams in person.

"Mia," "Deborah," and "Kandy." Her legal name is Deborah Ameia Cooper. According to B.F., because Williams called the woman "Kandy," she also used the name "Kandy." After this first meeting with Kandy, B.F. accompanied Williams and Kandy to Wal-Mart so Williams could buy B.F. some "cute underwear." When they all returned to the hotel, Williams took pictures of B.F. and Kandy in their underwear. He then created an advertisement on Backpage with the pictures. B.F. testified about the process of posting Backpage ads:

> [W]hat you do is you first get a gift card. It's a Vanilla gift card. And to post a page on Backpage, it's about $12. But the thing about it is, is you're competing with over 50,000 girls from all different countries, states, cities, so you constantly have to keep posting an ad to get it to the top because you have to get the first three pages in order for someone to call you, which is basically the client. And then, you just proceed from there.

The Backpage ads that were introduced as exhibits at trial look similar. They all show the email address of krobin209@yahoo.com. They all include pictures of B.F. and Kandy. After the pictures, there is a message. Sometimes the message is from "Amber" (B.F. used this name). Sometimes the message is from "Kandy." Whether the message claims to be from Amber or Kandy, the text is the same: [3]

> Hi, Im Kandy.!!! [or "Hi, Im Amber!"] Come enjoy yourself in a more upscale atmosphere. If you like my pictures, you will love me in person. I love to have a good time.. Some come have some fun with me :) you wont be disappointed! I am Native American, Blk & White. More like the Girl Next Door. Thank you! 2 GIRL SPECIAL!!
> 50 qk
> 80 hh
> 120 hr
> **PLEASE TEXT OR EMAIL** AND MAKE SURE U SAY UR FROM BACKPAGE OR NO REPLY *NO CALLS* krobin209@yahoo.com
> 254-245-2663 KANDY
> 254-393-5060 AMBER
> IN/ OUT CALL NOW!!
> Poster's age: 20

---

[3] The message from the ad is quoted verbatim with grammatical and typographical errors.

B.F. explained that "qk" meant ten minutes, "hh" meant a half hour, and "hr" meant an hour. Thus, the charges were $50 for ten minutes, $80 for thirty minutes, and $120 for an hour. According to B.F., they traveled from Killeen to Austin to San Antonio, and Williams set the prices depending on which city they were in. Williams also set a goal of $600 per day for B.F. and $800 per day for Kandy. B.F. testified she and Kandy would stay in a hotel room while Williams either waited in his Cadillac or stayed in his own hotel room. B.F. would communicate with Williams by text. After B.F. talked to a client and the client agreed to a service, B.F. would text Williams:

> I would say a QK, which he knows is quickie for $50, and then, he'll reply back. And then, the client—I would go get the client, and I would bring them upstairs, and I would text him "I," which means inside, which means the client is inside the room with me, and I'm about to get the money. And that basically lets him know, you now, time by time what I'm doing. Once I'm done, once I've got the money, I would text W, and then, he would text C or H. "C" meant coming up, which means he's coming up to the room, or he'll text "H" was – which is here I come, you know; I'm about to come up to the room.

B.F. testified the customers never saw Williams. Kandy would either remain in the room "if the client was okay with it," or "step outside the room and go down the hall, but she had to stay close just in case she had a client." "And we would kind of swap back and forth."

According to B.F., she began working with Williams and Kandy the week after she first met Williams in person (i.e. December 2013). They all lived in Williams's apartment on Winkler Avenue in Killeen, which was across the street from B.F.'s high school and about a five-to-ten-minute walk from her mother's apartment. They worked every day except Sunday, because on Sundays they went to church.[4]

At the time she left home to move in with Williams and Kandy, B.F. was on juvenile probation "for stealing out of a car." B.F. testified she was "supposed to be in the house before 7:00 p.m." and "check in" with her probation officer every week. However, once she started

---

[4] B.F. testified the only exception to this general rule was when they had not made enough money during the week.

working with Williams and Kandy, and was always out of town, she stopped making her weekly appointments with her probation officer.

On August 19, 2014, Williams, B.F., and Kandy were all arrested at a hotel in Killeen, Texas. B.F. testified,

> Mia [Kandy] had told me she was texting a client, that he was coming by, so I said okay. I was going to go downstairs and get me something to snack on because I was a little hungry. After I got my snack, I came back upstairs, and Mia, she was to go get something to snack on and, you know, get something to eat because we were hungry. And I believe we actually didn't have any more TV dinners, so she went down. And I was actually about to light a cigarette, and I kept sitting there thinking, "Wow, she's taking a really long time," and she walks pretty fast. So, I just kept sitting there. And just as I was about to light my cigarette, the door opens. And I'm thinking it's her, so I'm not paying attention, and it's police officers. And they're saying, "Are you [B.F.]?" And, immediately, I freeze, and I'm looking. They just kept saying it, "Are you [B.F.]?" And I said, "Yes." And they said, "Okay. Well, we've been looking for you for a really long time," and they said, "Are you okay?" I said, "Yes." And they said, "Is he here?" I said, "No." I said, "Who" – and you know, I already knew who they were talking about, but I was really mostly just in shock because they were pointing guns at me, but I know it – it wasn't, you know, like that. After that, they had handcuffed me and took me downstairs where I had saw Kandy sitting [in] a chair, and they were talking to me. I forgot about what. And then, just as they were sitting there talking to me, I see Issac [Williams] pull up. But at first, I knew he was coming. I'd seen his car. But first, he pulled up to the side door and then to the front entrance of the hotel. And immediately, I start freaking out because he's really big on not telling the police, the feds anything about what we're doing. He told me, "If you get caught, deny everything because if you get caught, it's a misdemeanor for probation. So, if you get caught, you go to jail, I will bail you out, and then, we'll just keep going." And so, when I had seen him, I told them—I was like, "You got to move me somewhere else." I was saying, "You got to move me somewhere else because if he sees me, I'm going to be in like big ass trouble." And they were like, "Okay. We're going to move you somewhere else." And that's when they had arrested him in front of the hotel.

B.F. testified she was arrested because she had a warrant for her juvenile probation violations. After her arrest, she talked with Sergeant Stormye Jackson, an investigator with the Special Investigations Unit of the Attorney General's office. B.F. told Sergeant Jackson about Kandy's and Williams's roles.[5]

---

[5] "Kandy" a/k/a Deborah Ameia Cooper entered into a plea-bargain agreement with the State and was placed on community supervision. She failed to report to her probation officer, and at the time of trial, was a fugitive.

Agent Shawn Hallett, a special agent with the Texas Department of Public Safety's Criminal Investigations Division, testified that he was part of an investigation seeking to find juvenile victims of human trafficking. He began his investigation by reviewing ads on Backpage and looking for images of people who appeared to be minors. Once he found an image of a person he believed to be a minor, he would try to identify the person using phone numbers, social media, and other databases to which he had access. During his investigation, he found one of the ads featuring "Kandy" and "Amber," and believed the images depicted a minor. He then ran the phone numbers contained in the ad through every database, including Facebook and other law enforcement databases. He was able to link one of the numbers in the ad to a Facebook account associated with B.F., who he discovered was a juvenile.

A subpoena was then prepared and sent to Backpage for the email on the ad, krobin209@yahoo.com. In response to the subpoena, Backpage produced over 3,000 pages of ads and invoices related to krobin209@yahoo.com. The dates on the ads range from December 9, 2013 to August 14, 2014. On all these ads, the email associated with the Backpage account is krobin209@yahoo.com. On almost all the invoices associated with the ads, the account person listed is "kandy" at a fake address (123 jake st) in Killeen, Texas. However, some of the invoices list "Issac Williams" at William's real address of 1309 Winkler Ave., Killeen, Texas. Williams's name appears on these invoices on the following dates: July 20, 2014, July 21, 2014, July 27, 2014, July 30, 2014, August 2, 2014, August 3, 2014, August 4, 2014, and August 5, 2014. At trial, every document produced by Backpage was admitted in evidence as State's Exhibit 1 over defense counsel's objection.

After obtaining the documents from Backpage, Agent Hallett testified he set up an undercover operation. On August 14, 2014, he contacted by text one of the phone numbers listed on the ad ("Kandy (254) 245-2663") and tried to set a date for Monday, August 18, 2014. However,

he did not receive a response to his text until the evening of August 18th. According to Agent Hallett, "Kandy" agreed by text to a date on the following day. Agent Hallett requested that both girls be present for the date. On the afternoon of August 19, 2014, Agent Hallett texted "Kandy" and, through text messages, was led to a hotel in Killeen, Texas. Deborah Ameia Cooper, otherwise known as "Kandy," let Agent Hallett in through a side door to the hotel. As he was following Kandy up a stairwell, Sergeant John Elizarde took her into custody. Agent Hallett then went to Kandy's hotel room and saw the door propped open. He announced "police," opened the door, and saw B.F. Agent Hallett testified he recognized B.F. from the ads and called out her name. After B.F. responded, he entered the room. Because he knew there was an outstanding juvenile warrant for B.F., he took her into custody at about 2:00 p.m. He then passed B.F. to Stormye Jackson, an investigator with the Attorney General's Office.

According to Sergeant Jackson, she obtained basic information from B.F., such as her age, date of birth, what she had been doing at the hotel, and who else had been involved. B.F. gave the investigators Williams's name and described his Cadillac.

Agent Hallett testified that the hotel room was registered to Deborah Ameia Cooper, otherwise known as "Kandy." They found three cell phones in the room and a box of condoms. According to Agent Hallett, when everyone had finished their respective duties at the hotel, they started to escort B.F. out:

> And as we're walking out the front door, [B.F.], for lack of a better term, has a complete meltdown, trying to – basically, almost falling to the ground. You could tell that it was a very fearful thing for her as she began to say, "That's him."[6]

Agent Hallett looked up and saw a Cadillac that matched B.F.'s description of Williams's car. Agent Hallett and a couple of other agents went to the parking lot. Agent Hallett recognized the

---

[6] All the law enforcement officers present testified similarly. Sergeant Jackson testified B.F. "started hyperventilating" and having a "panic attack" while she was saying, "That's him. That's him."

driver as Issac Williams. Agent Hallett testified that as Williams saw the officers come out of the hotel, he backed out of a parking spot and was attempting to maneuver in the parking lot. Agent Hallett believed Williams was attempting to leave, so he and the other officers stopped Williams's car. Agent Hallett placed Williams under arrest and searched his person and vehicle. In the car, he found four cell phones, boxes of condoms, and multiple gift cards. Agent Hallett testified he made the inventory of what had been seized at 4:20 p.m. He was later able to link the gift cards to the Backpage ads posted by krobin209@yahoo.com.

Sergeant John Elizarde, an investigator with the Attorney General's Office, testified to the same facts as Agent Hallett with regard to the Backpage investigation, the process under which they found the ads in question, how they identified B.F. in the ads through Facebook, how they subpoenaed Backpage for the ads related to the krobin209@yahoo.com email, and the sting operation on August 19, 2014. He added that they linked "Amber" in the Backpage ad to B.F. by putting the phone number listed for "Amber," (254) 393-5060, into Facebook. Once they tracked down B.F.'s identity through her Facebook page, they determined she was "a runaway out of Killeen" and had been reported missing in May 2014 by her mother. He also testified that "Issac" on Williams's driver's license is spelled the same way "Issac" is spelled on the Backpage invoices. Further, the address listed on the Backpage invoice, 1309 Winkler Ave., is the same address listed on Williams's driver's license.

The three cell phones found in the hotel room and the four cell phones found in Williams's car were admitted in evidence. "Device 1," "Device 2," "Device 6," and "Device 7" were found in Williams's car. "Device 3," "Device 4," and "Device 5" were found in the hotel room. Johnny Hirst, a former special agent with the Texas Department of Public Safety's Criminal Investigations Division, testified he took photos of the hotel room and prepared a search warrant and affidavit for

the cell phones. All seven phones were sent to Christopher Hill of the Victoria Police Department's Cyber Crimes Unit for analysis.

Hill testified Device 1 was a ZTE phone with the phone number (412) 596-4519. He could not download the phone because the software he uses to extract information was not supported by the device. He did take several photos of the contents of the phone, which were admitted in evidence.

Device 2 was a black Cricket Samsung. According to Hill, Device 2 no longer had a working phone number, but at one point used the same SIM card as Device 4 and thus the same phone number of (254) 245-2663. Hill was able to recover call log contacts, a timeline, a user dictionary, and some data files from Device 2.

Device 6 was a Samsung Galaxy S5. According to Hill, Device 6 was associated with two numbers: (254) 285-7788[7] and (254) 393-5060.[8] Hill testified Devices 5 and 6 both had the phone number (254) 393-5060 at some point because they used the same SIM card. Hill was able to do a complete download on this phone, which was admitted in evidence. The exhibits containing the download of contents from the phone reflected messages were sent to the phone from someone who called himself "Issac from fb." A message dated December 18, 2013 from "Issac" stated, "I'm right here, and I'm ready to be there for you." Further, a TxTag toll account on the phone had the billing address of 1309 Winkler Ave, Apartment 838, Killeen, Tx, which was Williams's home address. The phone listed the contact "Kandy" as (254) 245-2663.[9] There was also a contact listed in the phone as krobin209@yahoo.com. Issac Williams's email was listed as a contact in the phone as tailz286@gmail.com. B.F. was listed as a contact with two phone numbers: (978) 533-4697 and (254) 393-5060. Kandy was listed as a contact with two phone numbers: (254) 449-1764 and (254)

---

[7] Williams testified this was his phone number.
[8] B.F. testified this was her phone number.
[9] Hill testified Device 4 is associated with this phone number.

245-2663. The internet history of the phone's browser showed that on July 29, 2014, a Backpage ad was accessed by the phone and purchased using the phone.

Device 7 was a Motorola flip phone. According to Hill, the phone number associated with this phone was (254) 449-1764. Because Device 7 did not support the software Hill used to do a forensic analysis, he was not able to download the phone. However, he did take pictures of the contents of the phone. Hill found a contact for "Lee" with the phone number (254) 393-5060.[10] A message was sent to Lee from Device 7 stating, "Well, wait. She got one." Hill also found communications between Device 7 and (254) 245-2663.

According to Hill, the phone number (254) 245-2663 was associated with Device 4, which was a Samsung Galaxy S4 found inside the hotel room. Thus, Hill testified a phone found in Williams's car was communicating with a phone found in the hotel room. The phone number (254) 245-2663 was also the phone number listed for "Kandy" on the Backpage ads.[11] When B.F. testified on direct examination, she stated this phone number belonged to Williams. However, on cross-examination, she stated that she did not know the phone number for Kandy (Deborah Ameia Cooper) and finally agreed that this number belonged to Kandy. Hill testified he was able to do a forensic analysis and retrieve text messages between this phone and (832) 263-6021, the number used by Agent Hallett in his undercover operation.

Also found in the hotel room was Device 3, a cell phone manufactured by Huawei. Hill testified this phone was associated with the phone number (254) 393-5059. According to Hill, he was not able to examine the contents of this phone because it was locked. He was able to examine the 8 GB micro SD card and SIM card on the phone, which had some call logs and contacts, but did not have any text messages.

---

[10] B.F. testified this was her phone number.

[11] Device 6 had a contact for "Kandy" with this phone number. Hill testified Device 4 is associated with this phone number.

Finally, the last phone found in the hotel room was Device 5, a phone manufactured by Alcatel and associated with (254) 393-5060. B.F. testified this was her phone number. According to Hill, he was not able to perform a forensic analysis on this phone because it had an active passcode. He was able, however, to retrieve some photos from the SIM card. Hill testified Device 5, which was found in the hotel room, and Device 6, which was found in Williams's car, have the same phone number. Hill concluded Devices 5 and 6 used the same SIM card at some point.

Sergeant Elizarde testified that a subpoena was also issued to Yahoo for the krobin209@yahoo.com email. The documents received in response show that "Kandy Robinson" was the person who created the email account on June 2, 2013. An alternate email associated with the account was tailz286@gmail.com.[12] The alternate phone listed for the yahoo account was (254) 245-2663. This was the phone number listed for "Kandy" on the Backpage ads and associated with Device 4, which was found in the hotel room. A second phone number listed on the Yahoo account was (254) 449-17641. This number has too many digits to be an accurate phone number; however, it is similar to the phone number for Device 7, which was (254) 449-1764. Device 7 was found in Williams's car. B.F. testified that krobin209@yahoo.com was Williams's email address. Williams testified it was Kandy's email address.

During questioning, Sergeant Elizarde testified that there was a text message sent on July 8, 2014 from Device 4, a phone found in the hotel room and associated with "Kandy," to Device 5, a phone also found in the hotel room and associated with B.F.'s phone number. The text message stated, "Make sure Issac doesn't see you." At trial, defense counsel argued this text message was evidence that (1) Device 4 was not Williams's phone, but was Kandy's phone, and (2) Kandy and B.F. were doing something they did not want Williams to know about.[13] Additionally, defense

---

[12] Williams testified this was his email address. According to Williams, he allowed Kandy to use his email address.
[13] During his testimony, Williams claimed he had no idea Kandy and B.F. had been prostituting themselves.

counsel, during questioning of Sergeant Elizarde, pointed out that before the date of this text message, none of the Backpage ads listed Issac Williams's name. However, one month later, Williams's name was listed on some of the Backpage ads. Thus, the defense argued the evidence showed Kandy and B.F. had a motive to falsify Williams's name on the invoices because they were angry at him about something.

Finally, the State presented evidence of bail jumping on Williams's part. Laurie Smith, the court coordinator for the 187th District Court, testified that Williams did not show up for a previous trial setting. The State argued the evidence of his bail jumping showed Williams's consciousness of guilt.

Williams testified in his own defense. According to Williams, in November 2010, he was going to school in Pennsylvania to obtain his associate's degree and was living with his aunt. He met Kandy (Deborah Ameia Cooper) through friends, and they had an on-and-off relationship. According to Williams, he completed his associate's degree and found a job examining propane gases. However, in 2013, he was laid off and decided to return to Texas. Kandy moved with him, and in May 2013, they moved in with Williams's father. Williams testified that in October 2013, he and Kandy leased their own apartment in Killeen. They met B.F. at a beauty supply store near both their and B.F.'s apartments. Williams testified that B.F. and Kandy bonded over a discussion about hair. They all became friends on Facebook. According to Williams, Kandy and B.F. were good friends and would go out a lot together. Williams claimed that B.F. did not live with him and Kandy, but was over a lot. Williams admitted that he flirted with B.F. on Facebook and later through text, but claimed that in December 2013 he blocked B.F. on Facebook. Williams testified B.F. became angry and claimed he was going to "pay" for blocking her.

Williams admitted that tailz286@gmail.com was his email address but claimed Kandy had access to it. He testified krobin209@yahoo.com was Kandy's email address, which she used "to

do hair and stuff." Williams was adamant that he never "pimped out" B.F. or Kandy. He also claimed he never met B.F. in person to recruit her.

According to Williams, in July 2014 he decided to move to Austin to find work, because his unemployment benefits were about to expire (he had not found a job since moving back to Texas). On August 1, 2014, he and Kandy moved to their new apartment in Austin. He testified B.F. came to Austin and picked up Kandy. They then went to Killeen together and stayed at the Sleep Inn. Williams testified he later drove to the Sleep Inn and spent time with Kandy; B.F. was not at the hotel, but later came into the room. Williams testified Kandy and B.F. wanted to smoke marijuana, and he left to visit a friend. He then returned to Austin. According to Williams, the next day, he drove back to Killeen to pick up Kandy at the hotel. When he arrived, Kandy, B.F., and B.F.'s boyfriend were in the hotel room. Williams testified Kandy "pulled [him] to the side" and gave him all these gift cards and credit cards. She told him B.F. was stealing from her and wanted Williams to keep the cards for her. According to Williams, he was then asked by B.F.'s boyfriend for a ride to the repair shop to pick up his car. Williams testified he then came back to the hotel to pick up Kandy. He tried to park, but the lot was full. He was trying to turn his car around to find another parking spot when "these guys run in front of my car at gunpoint" and stopped his car. Williams got out of the car and was immediately arrested. His person and his car were searched.

The officers found four phones in Williams's car. Two were found in his trunk and two were found inside the passenger compartment. Williams testified his phone number was (254) 285-7788, which was associated with Device 6. Device 6 was found inside the passenger compartment of Williams's car. Williams explained all the incriminating information found on Device 6 was a result of him and Kandy switching phones a few days before. According to Williams, they had "merged" their phones at the mobile phone store. Williams testified Kandy had four phones because she kept buying new ones and upgrading.

According to Williams, Device 7, the flip phone also found in the passenger compartment of his car, belonged to Kandy. When asked by the State how Device 4, a phone associated with "Kandy's" number and found in the hotel room, could have been communicating that day with Device 7, Williams changed his testimony. He blamed B.F.'s boyfriend, whom Williams had given a ride. Williams testified Device 7 must have fallen out of the pocket of the boyfriend's pants. Williams suspected that B.F.'s boyfriend was the one working with B.F. Williams claimed Kandy had told him B.F. and her boyfriend had been trying to recruit her, information Williams claimed he had not known at the time of the arrest but learned later. According to Williams, the boxes of condoms found in his trunk were his condoms. He pointed out that the condoms found in the hotel room were different than the ones he had in his trunk.

Williams admitted that the messages on his phone the day of the arrest show that he was flirting with other women. But, Williams argued that he was only flirting and was not recruiting women for prostitution.

After all the evidence was presented, Williams was found guilty of continuous trafficking of B.F. and was sentenced to fifty years of imprisonment. On appeal, he brings twenty-three issues. In particular, Williams argues in his ninth issue that the trial court erred in denying his request for an instruction on the lesser-included offense of human trafficking.

### ISSUE 9: JURY CHARGE-INSTRUCTIONS ON LESSER-INCLUDED OFFENSES

Williams was charged with the offense of continuous trafficking of persons from on or about December 22, 2013 through August 18, 2014. At trial, his requests for instructions on the lesser-included offenses of human trafficking, compelling prostitution, and prostitution were denied. Williams argues on appeal that he suffered harm as a result of the trial court's failure to give the requested instructions.

The court of criminal appeals has explained that the "purpose of liberally permitting charges on lesser-included offenses" is to prevent putting the jury in the predicament of choosing between two "equally distasteful" options, *Bignall v. State*, 887 S.W.2d 21, 24-25 (Tex. Crim. App. 1994), and thereby "uphold the integrity of the system," *Grey v. State*, 298 S.W.3d 644, 656 n.22 (Tex. Crim. App. 2009).

> If no charge [on the lesser-included offense] is given, then the jury has two options which are equally distasteful. The first option is to vote not guilty in a situation where they believe the defendant committed [the lesser offense]. The other option is to vote guilty of [the greater offense], an offense they believe the defendant did not commit.

*Eldred v. State*, 578 S.W.2d 721, 723 (Tex. Crim. App. [Panel Op.] 1979), *overruled in part by Hall v. State*, 225 S.W.3d 524 (Tex. Crim. App. 2007).

In determining whether the trial court erred in denying Williams's requested instructions, we use a two-step analysis. *Ritcherson v. State*, No. PD-0021-17, 2018 WL 6519277, at *2 (Tex. Crim. App. Dec. 12, 2018) (citing *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993)). "First, we compare the elements and the facts of the offense alleged in the indictment with the elements of the potential lesser-included offense to determine whether the lesser-included offense is included within the proof necessary to establish the charged offense." *Munoz v. State*, 533 S.W.3d 448, 453 (Tex. App.—San Antonio 2017, pet. ref'd); *see also Ritcherson*, 2018 WL 6519277, at *2. "This question is a matter of law and is not dependent on the evidence to be produced at trial." *Munoz*, 533 S.W.3d at 453; *see also Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016).

"Second, there must be evidence from which a rational jury could find the defendant guilty of only the lesser offense." *Ritcherson*, 2018 WL 6519277, at *2 (citing *Bullock*, 509 S.W.3d at 925). "That requirement is met if there is (1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) evidence that

is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense." *Id.* (citing *Saunders v. State*, 840 S.W.2d 390, 391-92 (Tex. Crim. App. 1992)). "The evidence raising the lesser offense must be affirmatively in the record." *Id.* "That is, a defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be 'directly germane to the lesser-included offense.'" *Id.* (quoting *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)).

"We consider all the evidence admitted at trial, not just the evidence presented by the defendant, and *if there is more than a scintilla of evidence* raising the lesser offense and negating or rebutting an element of the greater offense, the defendant is entitled to a lesser-charge instruction." *Id.* (citations omitted) (emphasis added). "It does not matter whether the evidence is controverted or even credible." *Id.*; *see Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994) ("The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given.").

> A. *First Step: Were any of Williams's requested instructions lesser-included offenses of continuous trafficking of persons?*

Article 37.09 of the Texas Code of Criminal Procedure provides that an offense is a lesser-included offense if:

> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09. Williams argues that human trafficking, compelling prostitution, and prostitution are lesser-included offenses of continuous trafficking of persons.

To traffic "means to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." TEX. PENAL CODE ANN. § 20A.01(4). As permitted by the indictment in this case, a person commits the offense of continuous trafficking of persons, "if, during a period that is 30 or more days in duration, the person engages two or more times in conduct that constitutes an offense under section 20A.02 [trafficking of persons] against one or more victims." *Id*. § 20A.03(a). As applicable in this case, a person commits trafficking of persons if the person knowingly:

> (7) traffics a child and by any means causes the trafficked child to engage in, or become the victim of, conduct prohibited by . . . (H) Section 43.05 (Compelling Prostitution); . . . or

> (8) receives a benefit from participating in a venture that involves an activity described by Subdivision (7) or engages in sexual conduct with a child trafficked in the manner described in Subdivision (7).

*Id*. § 20A.02(a)(7)(H), (8). A "child" is defined as "a person younger than 18 years of age." *Id*. § 20A.01(1). Further, a person commits the offense of compelling prostitution "if the person knowingly . . . (2) causes another by any means a child younger than 18 years to commit prostitution, regardless of whether the actor knows the age of the child at the time of the offense." *Id*. § 43.05(a)(2). Finally, a person commits prostitution if the person "knowingly offers or agrees to receive a fee from another to engage in sexual conduct." *Id*. § 43.02(a).

As charged in this case, the only difference between the offenses of continuous trafficking of persons and trafficking of persons is that the offense of continuous trafficking of persons requires proof Williams, "during a period that is 30 or more days in duration," engaged "two or more times in conduct that constitutes" trafficking of persons. Therefore, we conclude trafficking of persons is included within the proof necessary to establish the charged offense of continuous

trafficking of persons. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(1); *Dukes v. State*, No. 13-14-00731-CR, 2016 WL 1393930, at *8 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd) (mem. op., not designated for publication) (holding trafficking of persons within proof necessary to establish continuous trafficking of persons). Having satisfied the first step of the analysis, we now proceed to the second step.

> B. *Second Step: Is there more than a scintilla of evidence from which a rational jury could find that Williams was guilty of only trafficking of persons and not continuous trafficking of persons?*

The second step of the analysis requires us to examine the entire record and determine whether there is "more than a scintilla of evidence" to support the defendant's request for the instruction on the lesser-included offense. *Bullock*, 509 S.W.3d at 925. "Although this threshold showing is low, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Id.* "However, we may not consider the credibility of the evidence and whether it conflicts with other evidence or is controverted." *Id.* (citation omitted). "Accordingly, . . . the standard may be satisfied if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations." *Id.* (citation omitted).

In considering whether the lesser-included offense of trafficking of persons is a valid, rational alternative to the charged offense of continuous trafficking of persons, "we must compare the statutory requirements between the greater offense—here, [continuous trafficking of persons]—and the lesser offense—here, [trafficking of persons]—to determine whether evidence exists to support a conviction for [trafficking of persons] but not [continuous trafficking of persons]." *Id.* On appeal, Williams points to evidence that refutes the element required for

continuous trafficking of persons that the defendant committed trafficking of persons two or more times "during a period that is 30 or more days in duration." *See* TEX. PENAL CODE ANN. § 20A.03(a). Specifically, Williams points to evidence relating to the posting of Backpage ads, noting that his name appears only on a few ads that ran from July 20th to August 7th, a period of time less than thirty days.[14]

The thousands of pages of Backpage ads admitted as State's Exhibit 1 show that all the ads were associated with the email krobin209@yahoo.com. The name and address on the invoices for almost all the ads was "kandy" at 123 Jake St., Killeen, Texas 76541. The dates on the ads range from December 9, 2013 to August 14, 2014.

"Issac Williams" with the address of 1309 Winkler Ave., Killeen, TX 76542 appears on the following invoices:

(1)     July 20, 2014, at 5:25 p.m.

(2)     July 20, 2014, at 10:01 p.m.

(3)     July 21, 2014, at 2:57 a.m.

(4)     July 30, 2014, at 10:32 a.m.

(5)     August 2, 2014, at 9:44 p.m.

(6)     August 3, 2014, at 12:53 a.m.

(7)     August 4, 2014, at 5:48 p.m.

(8)     August 4, 2014, at 8:15 p.m.

---

[14] Williams also relies on *excluded* evidence showing he "was not engaging in this offense, if at all, every day from January 1, 2014 until August 19, 2014 as B.F. testified." According to Williams, "[t]he excluded probation evidence established that B.F. was living at home until the end of May at the earliest." Thus, Williams argues this excluded evidence established that if he "was trafficking B.F., he may have only done it in a period of time that was less than 30 days." However, Williams cannot rely on excluded evidence to support his argument that he was entitled to an instruction on a lesser-included offense; in making that determination, a court considers only evidence that was admitted. *See Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011) (explaining if the offense contained in the requested instruction is a lesser-included offense of the charged offense, the court must then "decide whether the *admitted* evidence supports the instruction") (emphasis added).

(9)     August 4, 2014, at 10:05 p.m.

(10)    August 5, 2014, at 1:25 a.m.

(11)    August 5, 2014, at 11:28 a.m.

(12)    August 5, 2014, at 4:06 p.m.

Thus, there is some affirmative evidence that Issac Williams placed and purchased the Backpage ads from July 20th to August 5th, a period less than thirty days. Williams argues this is affirmative evidence from which a rational jury could find him guilty of only trafficking of persons.

In response, the State argues that the "fact that Williams's name only appears [on] some of the ads does not negate other evidence establishing that he encouraged B.F. to engage in prostitution as early as December 2013 when he took her to a motel to meet Deborah Cooper [Kandy] and explained to her details of the prostitution business." According to the State, the "evidence does not affirmatively negate that Williams took the pictures that featured both B.F. and Cooper [Kandy] in the Backpage ads." "Nor does it affirmatively negate B.F.'s testimony that Williams drove her to motels where she had sex for money on every occasion." We disagree with this analysis by the State. The affirmative evidence from which a rational jury could find Williams guilty of only trafficking of persons need not rebut all other evidence. It need only be "some evidence," that is, more than a "scintilla," "directly germane to the lesser-included offense for the finder of fact to consider." *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). Moreover, a court "may not consider the credibility of the evidence and whether it conflicts with other evidence or is controverted," *id.* at 446-47, because "a jury is permitted to believe or disbelieve any part of a witness's testimony," *Bullock*, 509 S.W.3d at 925.

In considering all the evidence presented at trial, we conclude there is more than a scintilla of evidence from which a rational jury could conclude Williams was guilty of only trafficking of persons and not continuous trafficking of persons. The Backpage ads relied on by Williams are

affirmative evidence directly germane to whether Williams trafficked B.F. for a period of more than thirty days. The Backpage ads are evidence from which a rational jury could conclude Williams was placing and posting ads in an effort to compel B.F. to commit prostitution from July 20, 2014 to August 5, 2014, a period of less than thirty days. The jury could compare how the invoices were completed and conclude different people posted the ads. Between July 20, 2014 and August 5, 2014, "Issac Williams" at his home address was invoiced twelve times. During that same time period, "kandy" at a fake address was invoiced many more times than "Issac Williams." Further, with regard to the ads placed before July 20, 2014 and after August 5, 2014, it was "kandy" again who was invoiced. Given the difference in how the ads were invoiced, the jury could have believed Williams posted only the ads where his name appears on the invoice and that someone else posted the other ads.

Additionally, the jury could infer from Kandy's text message to B.F. on July 8, 2014, which instructed B.F. to "make sure Issac doesn't see you," that before July 20, 2014 (the date Williams's name first appeared on the Backpage invoices), Kandy and B.F. were acting without Williams's knowledge. The jury could also believe Williams's testimony that Kandy and B.F. were acting without his knowledge during part of the period of time in question, but disbelieve his testimony that he did not know they were engaging in prostitution at the time of his arrest. The jury could also disbelieve the other evidence showing Williams was committing the offense for a period more than thirty days. Instead, the jury could believe it was Kandy, otherwise known as Deborah Ameia Cooper, who acting on her own was the person trafficking B.F. for the period of time before July 20, 2014 and after August 5, 2014. In making this determination, the jury could rely on evidence showing that (1) "Kandy" appeared on almost all the ads; (2) Deborah Ameia Cooper was identified as "Kandy"; and (3) Kandy's phone found in the hotel room contained text messages between her and Agent Hallett. The jury could also believe Williams's testimony that the reason

his phone, which police found in his car, had incriminating evidence on it was because he had "merged" his phone with Kandy's phone only a few days before the arrest at the Sleep Inn.

The likelihood of the jury actually making these conclusions is immaterial to the issue of whether Williams was entitled to an instruction on the lesser-included offense of trafficking of persons. In *Bignall*, 887 S.W.2d at 24, the court of criminal appeals noted that the evidence relied on by the appellant, the testimony of an accomplice, was "suspect." Nevertheless, the court emphasized that "the jury is the sole judge of the credibility of the witnesses, and it does not matter whether the evidence is strong, weak, unimpeached or contradicted." *Id.* (citing *Booth v. State*, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984)). Thus, the court held the trial court erred in failing to give the requested instruction on the lesser-included offense. *Id.*

Because (1) the only difference between continuous trafficking of persons and trafficking of persons is the time period of more than thirty days, and (2) the admitted Backpage ads and other testimony provide affirmative evidence showing Williams committed the offense for a period of less than thirty days, we hold Williams was entitled to an instruction on the lesser-included offense of trafficking of persons.

### C. Was Williams harmed by the trial court's denial of his requested instruction on the lesser-included offense of trafficking of persons?

We analyze harm regarding an erroneous refusal to give a requested instruction on a lesser-included offense under the standard enunciated in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). *See Grey*, 298 S.W.3d at 648. Because Williams preserved error by requesting the lesser-included instruction, we reverse the conviction if the denial of the instruction resulted in some harm to him. *Cornet v. State*, 417 S.W.3d 446, 449 (Tex. Crim. App. 2013). "Some harm" means actual harm and "not just a theoretical complaint." *Id.* at 449-50. In evaluating whether some harm exists, we "consider the totality of the record," including the "entire

jury charge," "the state of the evidence, including the contested issues and weight of probative evidence," "the argument of counsel," and "any other relevant information revealed by the record of the trial as whole." *Id.* at 450.

When a lesser-included instruction is erroneously denied, the jury is also "denied the opportunity to consider the entire range of offenses presented by the evidence." *Saunders v. State*, 913 S.W.2d 564, 571 (Tex. Crim. App. 1995) (citation omitted). That is, when a lesser-included instruction raised by the evidence is denied, a jury, "believing the defendant to have committed some crime, but given only the option to convict him of a greater offense, may have chosen to find him guilty of that greater offense, rather than to acquit him altogether, even though it had a reasonable doubt he really committed the greater offense." *Id.* (discussing rationale by Supreme Court in *Beck v. Alabama*, 447 U.S. 625, 634 (1980)). Thus, the court of criminal appeals has "routinely found 'some' harm, and therefore reversed, whenever the trial court has failed to submit a lesser included offense that was requested and raised by the evidence—at least where that failure left the jury with the sole option either to convict the defendant of the greater offense or to acquit him." *Id.* According to the court, "'some' harm occurs because the jury was not permitted to fulfill its role as factfinder to resolve the factual dispute whether the defendant committed the greater or lesser offense." *Id.*

Here, the jury charge permitted the jury to either convict Williams of continuous trafficking of persons or to acquit him altogether. Although Williams requested the lesser-included instruction on trafficking of persons and although there was some evidence to support the submission of trafficking of persons, the jury was "denied the opportunity to consider the entire range of offenses presented by the evidence." *Saunders*, 913 S.W.2d at 571. Therefore, we conclude Williams suffered some harm by the trial court's refusal to submit the lesser-included offense of trafficking of persons.

## CONCLUSION

Because Williams was entitled to the lesser-included instruction on trafficking of persons and because he suffered some harm by its omission, we reverse the judgment of the trial court and remand the cause for a new trial.[15]

Liza A. Rodriguez, Justice

Publish

---

[15] As none of Williams's other twenty-two issues would require rendering a judgment of acquittal, having determined that Williams is entitled to a new trial, we need not reach the merits of those other twenty-two issues.